J. Samuel Tenenbaum
Bluhm Legal Clinic
Northwestern University School of Law
375 E. Chicago Avenue
Chicago, Illinois 60611
(312) 503-4808 (telephone)
(312) 503-8777 (facsimile)
s-tenenbaum@law.northwestern.edu

*Representative and Attorney for William Adamczyk*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| William Adamczyk | **)** | |
| | **)** | |
| Plaintiff | **)** | |
| | **)** | Case No. 16-cv- |
| v. | **)** | |
| | **)** | Complaint for Damages |
| Earl D. Miller, | **)** | |
| Matthew Gingerich, | **)** | |
| 5 Star Investment Group I, LLC | **)** | |
| 5 Star Investment Group V, LLC, | **)** | |
| 5 Star Investment Group VII, LLC, | **)** | |
| 5 Star Investment Group, LLC, | **)** | |
| 5 Star Commercial, LLC, | **)** | |
| 5 Star Portland Holdings, LLC, | **)** | |
| Twin City of Winston Salem, LLC, | **)** | |
| Southern Equity Group Trust, | **)** | |
| Metro Homes Northwest, LLC, and | **)** | |
| Dilusso Homes, LLC | **)** | |
| | **)** | |
| Defendants | **)** | |
| | **)** | |

## <u>COMPLAINT</u>

## INTRODUCTION

Plaintiff William Adamczyk alleges as follows:

1. This case is about the illegal and fraudulent business practices of Earl Miller, Matthew Gingerich, and the dozens of corporate entities they created to carry out their scheme against unsophisticated and vulnerable investors.

2. Plaintiff William Adamczyk is a retired veteran living primarily off of social security. He has lost almost his entire life savings as a result of his involvement with the Defendants.

3. Defendants Miller and Gingerich created a network of Indiana Limited Liability Corporations to issue securities in the form of promissory notes for the ostensible purpose of investing in the building and/or the rehabilitation of real estate.

4. In order to recruit investors for these entities, Miller and Gingerich relied on both general advertising and a referral system driven by finders fees awarded to current investors.

5. Miller, Gingerich, and their investment entities purportedly sold the securities pursuant to the registration exemption under Securities Act Regulation D. The terms of these offerings themselves also provided for their sale to only "accredited investors" or "sophisticated non-accredited" investors.

6. In spite of this, Miller, Gingerich, and their investment entities intentionally marketed and sold their securities primarily to novice investors of limited means, including members of the Amish community in Indiana.

7. Miller in fact advertised and represented himself as former Amish in order to cultivate trust and take advantage of these inexperienced investors.

8.      In addition to material misrepresentations about the purchasers of the securities, Miller and Gingerich falsely represented they would not conduct general solicitations or employ advertising.

9.      In 2013, Plaintiff was recruited by his brother to invest in Miller and Gingerich's companies by his brother as part of a referral program.

10.      In exchange for investments totaling $125,500, Miller, Gingerich, and their investment entities gave Plaintiff three promissory notes with a fixed rate of return of 10% per year and paid monthly, far in excess of then-prevailing rates for other fixed-return investment vehicles. Various developers purportedly financed by the securities also guaranteed some of Plaintiff's notes.

11.      Miller, Gingerich, and their investment entities repeatedly lied to Plaintiff in order to secure his initial investments, to retain control of those same investments, and utilized an intricate corporate shell game to avoid detection by regulators.

12.      Plaintiff received payments on his various notes through July 2015. His August 2015 payments never arrived, and all three of his outstanding notes are now in default.

13.      Each promissory note issued to Plaintiff was associated with a particular piece of property, and Plaintiff received mortgages in connection with at least some of the initial promissory notes.

14.      Over the next two years, Plaintiff was repeatedly asked to release his existing notes and to roll his principal investments over into new properties in exchange for new promissory notes with virtually identical terms. Ultimately, Plaintiff's investments would become associated with ten different promissory notes.

15.     Defendants Miller, Gingerich, and their investment entities deceived Plaintiff into believing that all of his notes were secured by first mortgages when, in fact, most were only associated with low priority liens or deeds of trust that failed to provide any meaningful security, if there was any lien secured at all.

16.     This material deception regarding the security interest was accomplished, in part, by repeatedly utilizing rollovers and presenting them as routine in order to create the impression of terms identical to the initial investments that were actually secured by first mortgages.

17.     Material misrepresentations about the investments' security interests were also accomplished through oral and/or written statements by Defendants Miller, Gingerich and their investment entities, including misleading, or conflicting, or untrue language contained within the promissory notes themselves and their associated private placement memorandums and disclosure documents.

18.     In addition to misrepresenting the quality of the investments' security, at least one of the promissory notes was never secured by any kind of lien at all.

19.     The real estate serving as collateral on at least one note signed by Metro Homes Northwest, LLC and Dilusso Homes, LLC as additional borrowers was partially sold off without repayment of any portion of Plaintiff's principal investment.

20.     In addition, Defendants Miller, Gingerich, and their investment entities made material misrepresentations by grossly overstating the value of the assets they owned and managed by millions of dollars and the level of expertise possessed by the company.

21.     Defendants Miller, Gingerich, and their investment entities also made material representations about how Plaintiff's invested funds would be used.  Each offering

4

provided for Miller and Gingerich to be paid only out of real profits. Despite this, invested funds were used to make large payments to both Miller and Gingerich, including over $600,000 paid to Gingerich to pay a personal debt owed by Miller.

22.     Miller and Gingerich created an elaborate network of LLC's in order to conceal their fraudulent conduct from both investors and government regulators. There is little to no meaningful distinction between the dozens of companies they created, with many of them operating as each others' managers and holding accounts.

23.     In February 2015 Miller signed a consent decree with the State of Indiana (Cause No. 13-0630) in connection with the sale of unregistered securities by his company 5 Star Capital, LLC.

24.     Given the similarities of the between the operation of 5 Star Capital, LLC and 5 Star Investment Group VII, LLC and their common management, the failures to disclose the Indiana investigation or the consent decree in three offerings sold to plaintiff by 5 Star Investment Group VII, LLC were material misrepresentations.

25.     Moreover, some of Plaintiff's invested funds were diverted by 5 Star Investment Group VII, LLC to 5 Star Commercial, LLC which in turn was misappropriating funds and investing them in highly speculative companies unconnected to real estate.

26.     From the beginning, Defendants Miller, Gingerich, and their investment entities directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails and operated in violation of Illinois common law, and numerous state and federal securities laws, including Sections 12(F)–(I) of the Illinois Securities Act [815/ILCS 5/12(F)–(I)], Section 10(b) of the Securities Exchange Act of

1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5, Section 17(a)(1) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)(1)–(3)], Section 12(a)(1) of the Securities Act [15 U.S.C. § 77l(a)(1) and 12(a)(2) of the Securities Act [15 U.S.C. § 77l(a)(2)].

27.     By targeting vulnerable investors like Plaintiff, making express material representations, utilizing repetitive rollovers and confusing language to mislead, misappropriating funds, breaching their fiduciary duties and setting up a maze of LLC's to conceal their fraudulent conduct, Defendants Miller and Gingerich's actions operated a constructive fraud on the Plaintiff.

28.     Plaintiff brings this action to recover from Defendants Miller, Gingerich, and their investment entities for the damages suffered as a result of their illegal conduct, and from the developers Metro Homes Northwest, LLC and Dilusso Homes, LLC any damages attributable to them.

## JURISDICTION AND VENUE

29.     This action alleges violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78j and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated pursuant to the Act, as set forth more fully below. Therefore this Court has jurisdiction of these claims under 15 U.S.C. § 78aa, 28 U.S.C. § 1331 and supplemental jurisdiction of his state law claims pursuant to 28 U.S.C. § 1367.

30.     This action alleges violations of the Securities Act of 1933, particularly violations of 15 U.S.C. § 77q(a)(1)–(3) and 15 U.S.C. § 77l(a)(1)–(2), as set forth more fully below. Therefore this court also has jurisdiction of these claims under 15 U.S.C.

§ 77v and 28 U.S.C. § 1331, and supplemental jurisdiction of his state law claims pursuant to 28 U.S.C. § 1367.

31.     This Court also has jurisdiction of the subject matter of this cause of action pursuant to 28 U.S.C. § 1332(a)(1) because of complete diversity of citizenship between the Plaintiff and the Defendants and because the matter in controversy exceeds the sum of $75,000, exclusive of interests and costs.

32.     Venue is proper under 28 U.S.C. § 1391(b)(2). Plaintiff resides in this district, and a majority of the events and omissions giving rise to his claims occurred in this district.

## PARTIES

33.     Plaintiff is and was at all times mentioned in this complaint a resident of the State of Illinois, and currently resides in Lake Bluff.

34.     Upon information and belief, defendant Earl D. Miller is and was at all times mentioned in this complaint, a resident of the State of Indiana.

35.     Upon information and belief, Matthew Gingerich is and was at all times mentioned in this complaint, a resident of the State of Indiana.

36.     Upon information and belief, Defendants 5 Star Investment Group I, LLC, 5 Star Investment Group V, LLC, 5 Star Investment Group VII, LLC, 5 Star Investment Group, LLC, 5 Star Commercial, LLC, and 5 Star Portland Holdings, LLC, are and were at all times mentioned in this complaint, corporations duly organized and existing under the laws of the State of Indiana, with their current principal places of business at 3131 Grape Road, Mishawaka, Indiana 46545.

37.     Upon information and belief, Defendant Twin City of Winston Salem, LLC, is and was at all times mentioned in this complaint, a corporation duly organized and existing under the laws of the State of Indiana, with its principal place of business at PO Box 706, Middlebury, Indiana 46540.

38.     Upon information and belief, Defendant Southern Equity Group Trust, is a living trust of which Defendant Earl D. Miller is Trustee.

39.     Many of the documents in Plaintiff's possession use "5 Star" and "5Star" interchangeably when referencing the various 5 Star corporations set up by Miller and Gingerich.

40.     Upon information and belief, the use of "5 Star" instead of "5Star" generates no meaningful distinction when referencing the various 5 Star corporate entities.

41.     Hereinafter, this complaint will only refer to the "5 Star" corporations and will not make note of any references to them as the "5Star" corporations within 5 Star documents.

42.     Given the close relationship between the corporations set-up by Miller and Gingerich, and the use of them collectively to carry out a fraudulent scheme, they will be referred to collectively as the "5 Star Companies" when conduct is attributable to them generally.

43.     "5 Star Companies" shall refer to the Defendants Southern Equity Group Trust, 5 Star Investment Group I, LLC, 5 Star Investment Group V, LLC, 5 Star Investment Group VII, LLC, 5 Star Investment Group, LLC, 5 Star Commercial, LLC, 5 Star Portland Holdings, LLC, and Twin City of Winston Salem, LLC.

44.     Upon information and belief, Defendant Metro Homes Northwest, LLC is and was at all times mentioned in this complaint a corporation duly organized and existing under the laws of the State of Oregon, with its principal place of business at 211 NE Weidler Street, Portland, Oregon 97232.

45.     Upon information and belief, Defendant Dilusso Homes, LLC is and was at all times mentioned in this complaint a corporation duly organized and existing under the laws of the State of Oregon, with its principal place of business at 4415 NE Sandy Boulevard #202, Portland, Oregon 97213.

**FACTUAL BACKGROUND**

**Summary of Plaintiff's Involvement with 5 Star**

46.     Plaintiff, William Adamczyk, is 70 years old, an Illinois native, and a Vietnam veteran. He is now retired and resides in Lake Bluff, Illinois.

47.     Upon information and belief, in the spring of 2013, at least one of the 5 Star Companies was operating a referral program. As part of this program 5 Star Companies' representatives would make unsolicited phone calls to existing investors and offer them $100 finders' fees for signing up new investors with the company.

48.     In May of 2013, Plaintiff's brother approached him about investing in 5 Star as part of this referral program. Plaintiff had seen advertising for the "5 Star Companies" and agreed to learn more. He accompanied his brother to the 5 Star Companies' office in Middlebury, Indiana. While there, they spoke with an employee and reviewed brochures.

49.     The week following his visit to 5 Star Companies' Middlebury office, Plaintiff called a representative from one of the 5 Star Companies in order to sign up and invest. In response, he was express mailed a packet of documents to his home in Illinois, with

instructions to sign, notarize and return them, as well as instructions to wire money to the company.

50.    Plaintiff signed and notarized all the documents and wired $50,000 (the First Principal Investment) to 5 Star Investment Group V, LLC in exchange for a promissory note (Note 1-1) with terms of ten percent interest paid monthly.

51.    Plaintiff would go on to invest two more principal sums in exchange for similar promissory notes. Just a few days after his First Principal Investment, Plaintiff wired $55,500 (the Second Principal Investment), and two months later he wired an additional $20,000 (the Third Principal Investment) for a total principal investment of $125,500.

52.    Plaintiff was provided documents stating that investor funds would never be transferred to the 5 Star Companies directly, and instead would be transferred directly to title attorneys conducting closings.

53.    Upon information and belief the representation regarding the management of invested funds was false when made, and Plaintiff's funds were transferred directly to 5 Star companies and their agents.

54.    Over the next two years, these three principal investments would become involved with at least eight different investment entities controlled by Gingerich or Miller, as well as at least three different Oregon real estate developers.

55.    Over the next two years, these three principal investments would become associated with ten different properties, and ten different corresponding promissory notes as the principal sums were repeatedly rolled over into new investments.

56.     Defendants Miller, Gingerich and the 5 Star Companies made repeated material misrepresentations in connection with these promissory notes regarding:

- The security interests for the notes;

- The compensation paid to Miller and Gingerich;

- Their expertise and familiarity with targeted real estate markets;

- The size and value of assets controlled by the companies;

- The existence of government lawsuits for securities violations;

- The use of the invested funds; and

- The companies' compliance with federal regulations, including:

  - The sale of the securities to exclusively accredited or sophisticated non-accredited investors;
  - Conducting general solicitations and employing advertising; and
  - Their eligibility for registration exemptions under Regulation D.

57.     The specific instances of each type of material misrepresentation described in the preceding paragraph are discussed in more detail below.

58.     The usual course of business would be for Plaintiff to receive a phone call prior to the expiration of a note, informing him a property had been sold off and asking if he wanted to roll over the principal into a new investment. Plaintiff would agree, and the company would express mail him a note satisfaction and a new promissory note for him to sign, notarize, and return. Often these documents would include a "private placement memorandum" purporting to describe the investment offering.

59.     The Promissory Notes received by Plaintiff all indicated that the company was filing reports with the SEC regarding each investment, and required Plaintiff to indicate whether he was an "Accredited Investor" or a "Sophisticated Investor."

60.     Plaintiff is not an "Accredited Investor" as defined by the SEC and does not have extensive investment experience. Plaintiff relies primarily on social security for income, and invested the majority of his cash savings in the securities offered by Miller and Gingerich's companies.

61.     Upon information and belief, the Defendants Miller, Gingerich, and their various investment companies failed to conduct even the most basic due diligence and lacked any reasonable belief that Plaintiff was a qualified investor.

62.     Upon information and belief, the Defendants Miller, Gingerich, and their various investment companies in fact targeted and cultivated less sophisticated investors like Plaintiff to fund their operations, including members of the local Amish community in Indiana.

63.     By continually rolling over Plaintiff's principal amounts into new investments, Miller, Gingerich, and the investment companies controlled by them, created the impression that the terms of the new investment were substantially identical to the initial investment.

64.     The Promissory Notes and Private Placement Memorandums received by the Plaintiff all contained language guaranteeing the investments would be secured by mortgages and liens on real property.

65.     Plaintiff received first mortgages in connection with some of his initial promissory notes.

66.     Defendants Miller, Gingerich, the investment companies controlled by them and/or their representatives, made oral representations to Plaintiff that led him to believe

all his investments would be secured by a first mortgage in his name, just as his initial promissory notes were secured.

67. But, upon information and belief, many of the later promissory notes were, in fact, not secured by first mortgages. Instead, the investments were often secured by second or third liens or deeds of trust that provided no meaningful security for Plaintiff's investments, if they were secured by any lien at all.

68. Defendants Miller, Gingerich, and/or the investment companies controlled by them made written representations in promissory notes and private placement memorandums that Plaintiff's investments would be secured by mortgages, and only specified in other parts of the documents that these may not be first mortgages..

69. Disclaimers within the private placement memorandums that first lien positions could not be guaranteed were ineffective because of competing language that investments would be "secured with a mortgage on the properties" and because Plaintiff was led to believe that terms would be identical to notes where he did receive a mortgage in his name.

70. Furthermore, upon information and belief, at least one of the promissory notes was not secured by a lien at all.

71. Plaintiff received monthly interest payments on his various promissory notes for over two years.

72. In June 2015, Plaintiff did not receive the monthly interest payments on his three outstanding notes.

73. In July 2015, Plaintiff received the overdue interest payments for the month of June, as well as for the month of July.

74.   Plaintiff never received his monthly interest payments on the three outstanding notes for August 2015 or for any month thereafter, and now all three notes are in default.

75.   Ultimately, despite being led to believe he would hold first mortgages on his investments, Plaintiff holds three outstanding promissory notes that are in default, one of which is completely unsecured by a lien, one of which is secured by a second deed of trust held by 5 Star on only a fraction of the original property serving as collateral, and one of which is secured by a second deed of trust held by 5 Star.

76.   Upon information and belief, Defendants Miller and Gingerich have set up a dizzying network of dozens of limited liability corporations in order to conceal their fraudulent scheme and misconduct.

77.   Upon information and belief, there is no meaningful separation between any of these corporations and their operations, with many of them managing and funding each other. For example, Twin City of Winston Salem, LLC, is apparently managed by 5 Star Commercial, LLC and funded, at least in part, by Plaintiff's investment in 5 Star Investment Group VII, LLC which is itself managed by 5 Star Investment Group, LLC, which also manages 5 Star Investment Group V, LLC, which at least in part, holds funds in escrow as they are transferred between 5 Star Investment Group VII, LLC and 5 Star Investment Group, LLC.

78.   Upon information and belief, there are also no meaningful distinctions between the assets of these various companies.

79.   Plaintiff received a letter from Earl Miller dated August 14, 2015 and addressed to holders of promissory notes with the following sixteen companies: 5 Star

14

Investment Group, LLC, 5 Star Investment Group I, LLC, 5 Star Investment Group II, LLC, 5 Star Investment Group III, LLC, 5 Star Investment Group IV, LLC, 5 Star Investment Group V, LLC, 5 Star Investment Group VI, LLC, 5 Star Investment Group VII, LLC, 5 Star Investment Group VIII, LLC, 5 Star Investment Group IX, LLC, 5 Star Investment Group X, LLC, 5 Star Investment Group XI, LLC, 5 Star Investing, LLC, 5 Star Commercial, LLC, 5 Star Portland Holdings, LLC, and.5 Star Indiana Holdings, LLC.

80.    In this August 14, 2015 letter, Miller revealed that "some of the original principals of the companies recently sold their ownership interest" to him, that some of the assets were incorrectly valued and that this had resulted in a "very tight cash-flow situation."

81.    Upon information and belief, the August 14, 2015 letter refers to payment Gingerich, at least in part with misappropriated funds belonging to the various companies.

82.    Upon information and belief, the across-the-board cash flow problems and the undifferentiated nature of the letter to investors in sixteen different companies reflects the commingling of their finances and assets.

83.    The Private Placement Memorandums and Disclosure Documents received by Plaintiff represented that Miller and/or Gingerich would be paid out of the companies' real profits, and would not be paid a wage or salary.

84.    Upon information and belief, Miller misappropriated company funds for his personal use, as well as to pay a personal debt to Gingerich.

85.     A lawsuit filed by the Securities Exchange Commission in the Northern District of Indiana on November 5, 2015 (No. 15-00519) alleges that Miller misappropriated over $1 million from 5 Star Commercial, LLC.

86.     Plaintiff's Third Principal Investment is associated with a property held in the name of Miller's company Twin City of Winston Salem, LLC, which is managed by 5 Star Commercial, LLC.

87.     Upon information and belief, Miller and Gingerich misappropriated Plaintiff's Third Principal Investment by taking funds from 5 Star Commercial, LLC.

88.     Upon information and belief, Miller and Gingerich misappropriated Plaintiff's First and Second Principal Investments by taking funds from 5 Star Commercial, LLC.

89.     As discussed in more detail below, in making all of the above misrepresentations, Miller, Gingerich and their companies acted with scienter, in that the knew or recklessly disregarded the falsity of their material misrepresentations.

**FIRST PRINCIPAL INVESTMENT**

90.     Plaintiff's First Principal Investment was made on or around May 18, 2013 in the amount of $50,000.

91.     The First Principal Investment would come to be associated with three different properties and promissory notes (Notes 1-1, 1-2, and 1-3).

**116 Coquillard (Note 1-1)**

92.     In exchange for wiring his First Principal Investment, Plaintiff received in the mail a "Disclosure Document", a mortgage, and a $50,000 Promissory Note dated May 21, 2013 and designated for a property at 116 Coquillard South Bend, Indiana 46617 (Note 1-1).

93.     Note 1-1 listed 5 Star Investment Group V, LLC as the Borrower, and was signed by Earl Miller as its manager.

94.     Note 1-1 provided for interest to accrue at a rate of ten percent per annum, and obligated 5 Star Investment Group V, LLC to make thirty consecutive monthly payments of $416.67 beginning July 15, 2013 and one prorated payment on June 15, 2013.

95.     Note 1-1 provides for the payment of the principal and all interest owed the sooner of thirty months from July 15, 2013 or the sale of the property serving as collateral.

96.     Note 1-1 also provides for the Borrower to pay all attorney's fees, paralegal's fees, and any costs and expenses incurred in its collection, and for a penalty of three percent on any payment delivered more than thirty days after the due date.

97.     Note 1-1 empowers the lender to declare all amounts owed under it immediately due in the event that the Borrower fails to pay interest.

98.     Note 1-1 also asks the Lender to initial whether he is an "accredited investor" or a "sophisticated non-accredited investor" in order to comply with Securities Exchange Commission filing requirements.

99.     The "Disclosure Document" Plaintiff received in connection with Note 1-1 (DD 1-1) is part of an offering of securities by 5 Star Investment Group VII, LLC despite its disclaimer that it is not a securities offering, and despite the fact that the borrower on Note 1-1 is in fact 5 Star Investment Group V, LLC.

100.     DD 1-1 states that funds invested with 5 Star Investment Group VII, LLC would be directed to or managed by 5 Star Investment Group V, LLC and possibly one or

more other companies which will be identified to private lenders before funds are accepted.

101.    DD 1-1 states that Matthew Gingerich and Earl Miller are the founders of 5 Star Investment Group, VII LLC.

102.    DD 1-1 states that Miller and Gingerich will be compensated out of the company's profits.

103.    Upon information and belief, the representation regarding Miller and Gingerich's compensation was false when made, and both Miller and Gingerich took payments from the company that were not real profits generated by the investments.

104.    DD 1-1 states that "[o]nly accredited investors or sophisticated non-accredited investors, with the guidance of a purchaser representative, resident in the United States, will be offered or sold such investment[.]

105.    Upon information and belief, Miller and Gingerich sold securities in connection with this offering to investors who were neither accredited investors nor sophisticated non-accredited investors.

106.    In making the material misrepresentations regarding their compensation, and the sale of the securities to only accredited or sophisticated investors, Miller, Gingerich, 5 Star Investment Group V, LLC and 5 Star Investment Group VII, LLC acted with scienter. When they made the misrepresentations Miller and Gingerich knew or recklessly disregarded that the securities were being offered to novice investors and that they would collect payments regardless of the real profits.

107.    After being asked to roll over his principal into a new investment, Plaintiff signed a Note Satisfaction document on Note 1-1 dated December 18, 2013.

**4109 NE Sumner (Note 1-2)**

108.     After being asked to roll over his investment in 116 Coquillard, Plaintiff received in the mail a "Disclosure Document" and a set of instructions asking him to sign a Note Satisfaction document for Note 1-1, and a $50,000 Promissory Note dated December 18, 2013 and designated for a property at 4109 NE Sumner, Portland Oregon 97211 (Note 1-2).

109.     Plaintiff signed and mailed both the Note Satisfaction and Note 1-2 back to the 5 Star Investment Companies' office in Indiana.

110.     Note 1-2 listed 5 Star Investment Group VII, LLC as the Borrower, and was signed by Earl Miller as its manager.

111.     Note 1-2 also listed Metro Homes Northwest, LLC as an additional borrower and was signed by Randall Palazzo as its manager.

112.     Note 1-2 provided for interest to accrue at a rate of ten percent per annum, and obligated 5 Star Investment Group, VII, LLC to make fourteen consecutive monthly payments of $416.67 beginning February 15, 2014 and one prorated payment on January 15, 2014.

113.     Note 1-2 also provides for the Borrower to pay all attorney's fees, paralegal's fees, and any costs and expenses incurred in its collection, and for a penalty of three percent on any payment delivered more than thirty days after the due date.

114.     Note 1-2 empowers the lender to declare all amounts owed under it immediately due in the event that the Borrower fails to pay interest.

115.    Note 1-2 also asks the Lender to initial whether he is an "accredited investor" or a "sophisticated non-accredited investor" in order to comply with Securities Exchange Commission filing requirements.

116.    The "Disclosure Document" Plaintiff received in connection with Note 1-2 (DD 1-2) is part of an offering of securities by 5 Star Investment Group VII, LLC despite its disclaimer that it is not a securities offering.

117.    DD 1-2 states that funds invested with 5 Star Investment Group VII, LLC would be directed to or managed by 5 Star Investment Group I, LLC and possibly one or more other companies.

118.    DD 1-2 states that Matthew Gingerich and Earl Miller are the founders of 5 Star Investment Group VII, LLC.

119.    DD 1-2 states that Miller and Gingerich know local real estate markets and look at numerous properties before purchasing them.

120.    Upon information and belief, the representation regarding Miller and Gingerich's familiarity with the real estate markets they invested in were false when made, and neither Miller nor Gingerich has any particular familiarity with Portland real estate markets.

121.    DD 1-2 states that Miller and Gingerich will be compensated out of the company's profits.

122.    Upon information and belief, the representation regarding Miller and Gingerich's compensation was false when made, and both Miller and Gingerich took payments from the company that were not real profits generated by the investments.

123.    DD 1-2 states that "[o]nly accredited investors or sophisticated non-accredited investors, with the guidance of a purchaser representative, resident in the United States, will be offered or sold such investment[.]

124.    Upon information and belief, Miller and Gingerich sold securities in connection with this offering to investors who were not accredited investors nor sophisticated non-accredited investors.

125.    In making the material misrepresentations regarding their compensation, their familiarity with real estate markets they invested in, and the sale of the securities to only accredited or sophisticated investors, Miller, Gingerich, 5 Star Investment Group I, LLC and 5 Star Investment Group VII, LLC acted with scienter. When they made the misrepresentations Miller and Gingerich knew or recklessly disregarded that the securities were being offered to novice investors, that they would collect payments regardless of the real profits, and that they lacked familiarity with Portland real estate markets.

126.    After being asked to roll over his principal into a new investment, Plaintiff signed a Note Satisfaction document on Note 1-2 dated June 16, 2015.

**625 SE 49th St.  (Note 1-3)**

127.    After being asked to roll over his investment in 4109 NE Sumner, Plaintiff received in the mail a Private Placement Memorandum and a set of instructions asking him to sign a Note Satisfaction document for Note 1-2, and a $50,000 Promissory Note dated June 16, 2015 and designated for Investment I10001423 (Note 1-3).

128.    Plaintiff signed and mailed both the Note Satisfaction and Note 1-3 back to the 5 Star Companies' office in Indiana.

129.    Investment I10001423 is a property located at 625 SE 49th St. Portland, Oregon 97215.

130.    Note 1-3 listed 5 Star Investment Group VII, LLC as the Borrower, 5 Star Investment Group, LLC as the manager of 5 Star Investment Group VII, LLC, and was signed by Earl Miller as "Manager".

131.    Note 1-3 provided for interest to accrue at a rate of ten percent per annum, and obligated 5 Star Investment Group VII, LLC to make thirty consecutive monthly payments of $416.67 beginning August 15, 2015 and one prorated payment on July 15, 2015.

132.    Note 1-3 also provides for the Borrower to pay all attorney's fees, paralegal's fees, and any costs and expenses incurred in its collection, and for a penalty of three percent on any payment delivered more than thirty days after the due date.

133.    Note 1-3 empowers the lender to declare all amounts owed under it immediately due in the event that the Borrower fails to pay interest.

134.    Note 1-3 also asks the Lender to initial whether he is an "accredited investor" or a "sophisticated non-accredited investor" in order to comply with Securities Exchange Commission filing requirements.

135.    A provision in Note 1-3 references a Private Placement Memorandum associated with the investment, and requires the Lender to acknowledge they had at least two business days to review it.

136.    The Private Placement Memorandum Plaintiff received in connection with Note 1-3 is dated April 23, 2014 (PPM 1-3).

137.    PPM 1-3 is for a $5,000,000 debt offering by 5 Star Investment Group VII, LLC, with a minimum investment of $15,000.

138.    PPM 1-3 states that securities would be sold by Earl Miller, the founder and manager of the company, and other employees acting as promoters.

139.    PPM 1-3 states that securities will only be sold to "Accredited Investors" as defined by the Securities Act or to sophisticated non-investors.

140.    Upon information and belief, the representations regarding purchasers of the securities were false when made, and Miller sold securities in connection with this offering to investors who were not accredited investors nor sophisticated non-accredited investors.

141.    PPM 1-3 states that no general solicitation would be conducted, and no offering literature or advertising in any form will or may be employed in the offering of the securities.

142.    Upon information and belief, the representations regarding general solicitation and the use of advertising were false when made, and Miller and the 5 Star Companies did conduct a general solicitation and employed advertising.

143.    PPM 1-3 states that "5 Star" has partnered with a South Carolina investment firm and that together they hold assets valued at over $50,000,000.

144.    Upon information and belief, the representation regarding the assets held by 5 Star Investment Group VII, LLC was false when made, and 5 Star Investment Group VII, LLC lacks meaningful control of assets anywhere near $50,000,000.

145.    PPM 1-3 states that "5 Star Investment Group is a member of an elite group of highly trained and experienced commercial and multi-family real estate professionals."

23

146.    Upon information and belief, the representation regarding the training and experience of 5 Star Investment Group VII, LLC was false when made, and 5 Star Investment Group VII, LLC was not a member of any group beyond Miller's own companies, much less an "elite" one, and did not employ highly trained professionals.

147.    PPM 1-3 states that Earl Miller will not be paid a salary or wages of any type by the company.

148.    Upon information and belief, the representation regarding Miller's compensation was false when made, and Miller took payments from the company that were not real profits generated by the investments.

149.    PPM 1-3 states "[t]here may be times when the Company will hold a lien position on behalf of its Investors, instead of the Investors themselves holding such a lien position."

150.    PPM 1-3 states "[i]nvested funds are a debt due from the LLC to its Private Lenders in the form of Promissory Notes, secured by the Company's investment in properties."

151.    Upon information and belief, the representation regarding the security interest in both Note 1-3 and PPM 1-3 was false when made, and no effective lien was ever acquired on the property.

152.    Upon information and belief, Note 1-3 was secured only by a Second Deed of Trust held in the name of 5 Star Investment Group, LLC.

153.    Upon information and belief, the Second Deed of Trust associated with Note 1-3 provides no meaningful security for the investments.

154.    PPM 1-3 contains a statement that the "Company may offer its investors 1st, 2nd or 3rd lien positions" which is inconsistent with the other language in the document.

155.    Moreover, Plaintiff was never offered a specific lien at all in connection with Note 1-3, and Note 1-3 does not provide for the type of lien that will be associated with the investment.

156.    PPM 1-3 contained no statements about an investigation by the State of Indiana into the sale of unregistered securities by 5 Star Capital Fund, LLC or the consent agreement with the State of Indiana signed by Miller in February 2015.

157.    Given both the interconnectedness of Miller's enterprises, and the similarity of the business practice of issuing promissory notes for fixed rate loans, the Indiana investigation and consent decree were material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

158.    In making the material misrepresentations regarding Miller's compensation, the company's group membership and expertise, the company's assets, the sale of the securities to only accredited or sophisticated investors, the nature of the lien associated with the investment, and the Indiana consent decree, Miller, 5 Star Investment Group VII, LLC, and 5 Star Investment Group, LLC acted with scienter. When he made the misrepresentations Miller knew or recklessly disregarded that the securities were being offered to novice investors, that he was conducting a general solicitation and employing advertising, that he would collect payments regardless of the real profits, that the company was not a member of an elite group or staffed by highly trained professionals, that he had entered into a consent decree with Indiana and that the lien on the property

did not meaningfully secure the investment and that the company did not meaningful control $50,000,000 in assets.

159.    To date, Plaintiff has received only one payment due under Note 1-3; a check dated July 15, 2015 in the amount of $410.96, which represents the initial prorated payment.

**SECOND PRINCIPAL INVESTMENT**

160.    Plaintiff's Second Principal Investment was made on or around May 23, 2013 in the amount of $55,500.

161.    The Second Principal Investment would come to be associated with two different properties and promissory notes (Notes 2-1 and 2-2).

**22209 CR 10 (Note 2-1)**

162.    In exchange for wiring his Second Principal Investment to 5 Star, Plaintiff received in the mail a "Disclosure Document", a mortgage, and a $55,500 Promissory Note dated May 24, 2013 and designated for a property at 22209 CR 10, Elkhart, Indiana 46514 (Note 2-1).

163.    Note 2-1 listed 5 Star Investment Group VII, LLC as the Borrower, and was signed by Earl Miller as its manager.

164.    Note 2-1 provided for interest to accrue at a rate of ten percent per annum, and obligated 5 Star Investment Group VII, LLC to make thirty consecutive monthly payments of $462.50 beginning July 15, 2013 and one prorated payment on June 15, 2013.

165.    Note 2-1 provides for the payment of the principal and all interest owed the sooner of thirty months from July 15, 2013 or the sale of the property serving as collateral.

166.    Note 2-1 also provides for the Borrower to pay all attorney's fees, paralegal's fees, and any costs and expenses incurred in its collection, and for a penalty of three percent on any payment delivered more than thirty days after the due date.

167.    Note 2-1 empowers the lender to declare all amounts owed under it immediately due in the event that the Borrower fails to pay interest.

168.    Note 2-1 also asks the Lender to initial whether he is an "accredited investor" or a "sophisticated non-accredited investor" in order to comply with Securities Exchange Commission filing requirements.

169.    The "Disclosure Document" Plaintiff received in connection with Note 2-1 (DD 2-1) is part of an offering of securities by 5 Star Investment Group VII, LLC despite its disclaimer that it is not a securities offering.

170.    DD 2-1 states that funds invested with 5 Star Investment Group VII, LLC would be directed to or managed by 5 Star Investment Group V, LLC and possibly one or more other companies which will be identified to private lenders before funds are accepted.

171.    DD 2-1 states that Matthew Gingerich and Earl Miller are the founders of 5 Star Investment Group VII, LLC.

172.    DD 2-1 states that Miller and Gingerich will be compensated out of the company's profits.

173.    Upon information and belief, the representation regarding Miller and Gingerich's compensation was false when made, and both Miller and Gingerich took payments from the company that were not real profits generated by the investments.

174.    DD 2-1 states that "[o]nly accredited investors or sophisticated non-accredited investors, with the guidance of a purchaser representative, resident in the United States, will be offered or sold such investment[.]

175.    Upon information and belief, this statement was false when made, and Miller and Gingerich sold securities in connection with this offering to investors who were not accredited investors nor sophisticated non-accredited investors.

176.    In making the material misrepresentations regarding their compensation, and the sale of the securities to only accredited or sophisticated investors, Miller, Gingerich, 5 Star Investment Group V, LLC and 5 Star Investment Group VII, LLC acted with scienter. When they made the misrepresentations Miller and Gingerich knew or recklessly disregarded that the securities were being offered to novice investors and that they would collect payments regardless of the real profits.

177.    After being asked to roll over his principal into a new investment, Plaintiff signed a mortgage release for the property in September of 2013.

**4134 N. Michigan Ave. (Note 2-2)**

178.    After being asked to roll over his investment in 22209 CR 10, Plaintiff received in the mail a "Disclosure Document" and a set of instructions asking him to sign a $55,500 Promissory Note dated October 18, 2013 and designated for a property at 4134 N. Michigan Ave., Portland Oregon 97217 (Note 2-2).

179.     Plaintiff signed and mailed Note 2-2 back to the 5 Star Companies' office in Indiana.

180.     On November 16, 2013, Plaintiff signed an authorization for the transfer of Second Principal Investment from an account held in the name of 5 Star Investment Group V, LLC to an account held in the name of 5 Star Investment Group, LLC to be used for the investment at 4134 N. Michigan.

181.     Note 2-2 listed 5 Star Investment Group VII, LLC as the Borrower, and was signed by Earl Miller as its manager.

182.     Note 2-2 was also signed and guaranteed by Matthew Gingerich and Earl Miller in their personal capacities.

183.     Note 2-2 also listed Metro Homes Northwest, LLC as an additional borrower and was signed by Randall Palazzo as its manager.

184.     Note 2-2 also listed Dilusso Homes, LLC as an additional borrower and was signed by Vlad Rudnitsky and Chris Baird as its managers.

185.     Note 2-2 provided for interest to accrue at a rate of ten percent per annum, and obligated 5 Star Investment Group VII, LLC to make thirty-one consecutive monthly payments of $462.50 beginning December 15, 2013 and one prorated payment on November 15, 2013.

186.     Note 2-2 also provides for 5 Star Investment Group VII, LLC to pay all attorney's fees, paralegal's fees, and any costs and expenses incurred in its collection, and for a penalty of three percent on any payment delivered more than thirty days after the due date.

187.    Note 2-2 empowers the lender to declare all amounts owed under it immediately due in the event that the Borrower fails to pay interest.

188.    Note 2-2 also asks the Lender to initial whether he is an "accredited investor" or a "sophisticated non-accredited investor" in order to comply with Securities Exchange Commission filing requirements.

189.    The "Disclosure Document" Plaintiff received in connection with Note 2-2 (DD-2-2) is part of an offering of securities by 5 Star Investment Group VII, LLC despite its disclaimer that it is not a securities offering.

190.    DD 2-2 states that funds invested with 5 Star Investment Group VII, LLC would be directed to or managed by 5 Star Investment Group, LLC and possibly one or more other companies which will be identified before any funds are distributed.

191.    DD 2-2 states that Matthew Gingerich and Earl Miller are the founders of 5 Star Investment Group VII, LLC.

192.    DD 2-2 states that Miller and Gingerich know local real estate markets and look at numerous properties before purchasing them.

193.    Upon information and belief, the representation regarding Miller and Gingerich's familiarity with the real estate markets they invested in were false when made, and neither Miller nor Gingerich has any particular familiarity with Portland real estate markets.

194.    DD 2-2 states that Miller and Gingerich will be compensated out of the company's profits.

195.     Upon information and belief, the representation regarding Miller and Gingerich's compensation was false when made, and both Miller and Gingerich took payments from the company that were not real profits generated by the investments.

196.     DD 2-2 states that "[o]nly accredited investors or sophisticated non-accredited investors, with the guidance of a purchaser representative, resident in the United States, will be offered or sold such investment[.]

197.     Upon information and belief, the representations regarding purchasers of the securities were false when made, and Miller and Gingerich sold securities in connection with this offering to investors who were not accredited investors nor sophisticated non-accredited investors.

198.     Note 2-2 states that "on June 15, 2015 or the sale of the real estate serving as collateral for this Note under a Mortgage of even date, the balance of all principal and interest due and owing under this note shall be paid in full."

199.     DD 2-2 states that "[i]nvested funds are secured with a mortgage on the properties, and when appropriate, with a state UCC filing to record the security interest in the properties" and only later states that "a first lien position can not be guaranteed."

200.     Upon information and belief, 5 Star only ever obtained a second deed of trust on the property, which failed to meaningfully secure Plaintiff's investment.

201.     Upon information and belief, at some point the 4134 N. Michigan property was subdivided into different parcels, one of which was sold by Metro Homes on or around May 1, 2014 to a third party.

202.     Plaintiff was never informed of the subdivision, the sale, and was never returned any part of his principal investment in connection with this sale.

203.    Upon information and belief, the subdivided parcel sold by Metro Homes was either never secured by a lien held by Plaintiff or 5 Star, or else was released by 5 Star representatives without Plaintiff's knowledge.

204.    Plaintiff was promised his principal would be secured by a mortgage on the property, and now only indirectly holds second deeds of trusts on fractions of the original property meant to secure his investment.

205.    Upon information and belief, the representations regarding the security for Plaintiff's investment were false when made because the liens failed to provide meaningful security.

206.    Upon information and belief the representations regarding the security for Plaintiff's investment were false when made because some of the real estate serving as collateral was sold off without repayment of the principal and interest owed to Plaintiff for that fraction of the property.

207.    In making the material misrepresentations regarding Miller and Gingerich's compensation, their familiarity with the Portland real estate market, the sale of the securities to only accredited or sophisticated investors, and the existence of a lien securing the investment, Miller, Gingerich, 5 Star Investment Group V, LLC, 5 Star Investment Group VII, LLC, and 5 Star Investment Group, LLC acted with scienter. When he made the misrepresentations Miller and Gingerich knew or recklessly disregarded that the securities were being offered to novice investors, that they would collect payments regardless of the real profits, that they never secured a lien on the property, and that they lacked familiarity with Portland real estate markets.

208. In making the material misrepresentation regarding the existence of a lien on the property, and regarding the return of Plaintiff's principal upon sale of the real estate serving as collateral, Metro Homes Northwest, LLC and Dilusso Homes, LLC acted with scienter. When they made the representation in Note 2-2, Metro Homes Northwest, LLC and Dilusso Homes, LLC knew or recklessly disregarded the real estate serving as collateral would be sold off without returning Plaintiff's investment.

209. To date, Plaintiff has received one prorated payment of $436.99 and twenty payments of $458.33.

210. Plaintiff never received the payment due on August 15, 2015 under this note, or any payment thereafter.

**THIRD PRINCIPAL INVESTMENT**

211. Plaintiff's Third Principal Investment was made on or around May 23, 2013 in the amount of $20,000.

212. The Third Principal Investment would come to be associated with five different properties and promissory notes (Notes 3-1—3-5).

**Sheriff Sale (Note 3-1)**

213. In exchange for wiring his Third Principal Investment to 5 Star, Plaintiff received in the mail a "Disclosure Document", a mortgage, and a $20,000 Promissory Note dated July 19, 2013 and designated for a property called "Sheriff Sale" (Note 3-1).

214. Note 3-1 listed 5 Star Investment Group VII, LLC as the Borrower, and was signed by Earl Miller as its manager.

215. Note 3-1 provided for interest to accrue at a rate of ten percent per annum, and obligated 5 Star Investment Group VII, LLC to make thirty consecutive monthly

payments of $166.67 beginning September 15, 2013 and one prorated payment on August 15, 2013.

216.     Note 3-1 provides for the payment of the principal and all interest owed the sooner of thirty months from September 15, 2013 or the sale of the property serving as collateral.

217.     Note 3-1 also provides for the Borrower to pay all attorney's fees, paralegal's fees, and any costs and expenses incurred in its collection, and for a penalty of three percent on any payment delivered more than thirty days after the due date.

218.     Note 3-1 empowers the lender to declare all amounts owed under it immediately due in the event that the Borrower fails to pay interest.

219.     Note 3-1 also asks the Lender to initial whether he is an "accredited investor" or a "sophisticated non-accredited investor" in order to comply with Securities Exchange Commission filing requirements.

220.     The "Disclosure Document" Plaintiff received in connection with Note 3-1 (DD 3-1) is part of an offering of securities by 5 Star Investment Group VII, LLC despite its disclaimer that it is not a securities offering.

221.     DD 3-1 states that funds invested with 5 Star Investment Group VII, LLC would be directed to or managed by 5 Star Investment Group V, LLC and possibly one or more other companies which will be identified to private lenders before funds are accepted.

222.     DD 3-1 states that Matthew Gingerich and Earl Miller are the founders of 5 Star Investment Group VII, LLC.

223.     DD 3-1 states that Miller and Gingerich will be compensated out of the company's profits.

224.     Upon information and belief, the representation regarding Miller and Gingerich's compensation was false when made, and both Miller and Gingerich took payments from the company that were not real profits generated by the investments.

225.     DD 3-1 states that "[o]nly accredited investors or sophisticated non-accredited investors, with the guidance of a purchaser representative, resident in the United States, will be offered or sold such investment[.]

226.     Upon information and belief, the representations regarding purchasers of the securities were false when made, and Miller and Gingerich sold securities in connection with this offering to investors who were not accredited investors nor sophisticated non-accredited investors.

227.     DD 3-1 states that Miller and Gingerich had sold millions of dollars in real estate and that they managed several LLCs with "several million dollars" of assets and over 120 investors.

228.     In making the material misrepresentations regarding their compensation, and the sale of the securities to only accredited or sophisticated investors, Miller, Gingerich, 5 Star Investment Group V, LLC and 5 Star Investment Group VII, LLC acted with scienter. When they made the misrepresentations Miller and Gingerich knew or recklessly disregarded that the securities were being offered to novice investors and that they would collect payments regardless of the real profits.

229.     In September of 2013, Plaintiff agreed to roll his Third Principal Investment into a new property.

**2025 Harold (Note 3-2)**

230.     After being asked to roll over his investment in Sheriff Sale, Plaintiff received in the mail a "Disclosure Document" and a set of instructions asking him to sign a $20,000 Promissory Note dated September 13, 2013 and designated for a property at 2025 SE Harold, Portland Oregon 97202 (Note 3-2).

231.     Plaintiff signed and mailed Note 3-2 back to the 5 Star Companies' office in Indiana.

232.     Note 3-2 listed 5 Star Investment Group VII, LLC as the Borrower, and was signed by Earl Miller as its manager.

233.     Note 3-2 was also signed and guaranteed by Matthew Gingerich and Earl Miller in their personal capacities.

234.     Note 3-2 also listed Metro Homes Northwest, LLC as an additional borrower and was signed by Randall Palazzo as its manager.

235.     Note 3-2 provided for interest to accrue at a rate of ten percent per annum, and obligated 5 Star Investment Group VII, LLC to make twenty-four consecutive monthly payments of $166.67 beginning October 15, 2013 and one prorated payment for the time period of September 13–15, 2013.

236.     Note 3-2 also provides for 5 Star Investment Group VII, LLC to pay all attorney's fees, paralegal's fees, and any costs and expenses incurred in its collection, and for a penalty of three percent on any payment delivered more than thirty days after the due date.

237.     Note 3-2 empowers the lender to declare all amounts owed under it immediately due in the event that the Borrower fails to pay interest.

238. Note 3-2 also asks the Lender to initial whether he is an "accredited investor" or a "sophisticated non-accredited investor" in order to comply with Securities Exchange Commission filing requirements.

239. The "Disclosure Document" Plaintiff received in connection with Note 3-2 (DD 3-2) is part of an offering of securities by 5 Star Investment Group VII, LLC despite its disclaimer that it is not a securities offering.

240. DD 3-2 states that funds invested with 5 Star Investment Group VII, LLC would be directed to or managed by 5 Star Investment Group, LLC and possibly one or more other companies which will be identified before any funds are distributed.

241. DD 3-2 states that Matthew Gingerich and Earl Miller are the founders of 5 Star Investment Group VII, LLC.

242. DD 3-2 states that Miller and Gingerich know local real estate markets and look at numerous properties before purchasing them.

243. Upon information and belief, the representation regarding Miller and Gingerich's familiarity with the real estate markets they invested in were false when made, and neither Miller nor Gingerich has any particular familiarity with Portland real estate markets.

244. DD 3-2 states that Miller and Gingerich will be compensated out of the company's profits.

245. Upon information and belief, the representation regarding Miller and Gingerich's compensation was false when made, and both Miller and Gingerich took payments from the company that were not real profits generated by the investments.

246.    DD 3-2 states that "[o]nly accredited investors or sophisticated non-accredited investors, with the guidance of a purchaser representative, resident in the United States, will be offered or sold such investment[.]

247.    Upon information and belief, the representations regarding purchasers of the securities were false when made, and Miller and Gingerich sold securities in connection with this offering to investors who were not accredited investors nor sophisticated non-accredited investors.

248.    In making the material misrepresentations regarding Miller and Gingerich's compensation, the sale of the securities to only accredited or sophisticated investors, and their familiarity with the investment's real estate market, Miller, Gingerich, 5 Star Investment Group VII, LLC, and 5 Star Investment Group, LLC acted with scienter. When they made the misrepresentations Miller and Gingerich knew or recklessly disregarded that the securities were being offered to novice investors, that they would collect payments regardless of the real profits, and that they lacked familiarity with Portland real estate markets.

249.    Plaintiff received a letter dated October 25, 2013 with instructions to sign an enclosed amendment to Note 3-2. The Amendment reallocated the Third Principal Investment to a property at 1116 NE Failing, Portland Oregon 97212. Plaintiff signed the amendment and mailed it to the 5 Star Companies' office in Indiana.

**1116 NE Failing (Note 3-3)**

250.    The Amendment to Note 3-2 (Note 3-3) reallocated the Third Principal Investment to a property at 1116 NE Failing, Portland Oregon 97212 and was dated October 16, 2013.

251.    Note 3-3 provided for 8 consecutive monthly payments of $166.57 beginning December 15, 2013 and one prorated November payment.

252.    Note 3-3 also provided for the payment of the principal and all interest owed the sooner of July 15, 2013 [sic] or the sale of the real estate serving as collateral.

253.    Note 3-3 was signed by Earl Miller as manager of 5 Star Investment Group, LLC.

254.    Note 3-3 was also signed and guaranteed by Matthew Gingerich and Earl Miller in their personal capacities.

255.    Note 3-3 also listed Metro Homes Northwest, LLC as an additional borrower and was signed by Randall Palazzo as its manager.

256.    Note 3-3 also listed West Coast Development Group, Inc. as an additional borrower and was signed by Chris Sakys as its president.

257.    Note 3-3 incorporated all of the other provisions in Note 3-2 as described above.

258.    In making the same material misrepresentations made in Note 3-2 regarding Miller and Gingerich's compensation, the sale of the securities to only accredited or sophisticated investors, and their familiarity with the investment's real estate market, Miller, Gingerich, 5 Star Investment Group VII, LLC, and 5 Star Investment Group, LLC acted with scienter. When they made the misrepresentations Miller and Gingerich knew or recklessly disregarded that the securities were being offered to novice investors, that they would collect payments regardless of the real profits, and that they lacked familiarity with Portland real estate markets.

259.     In April 2014, Plaintiff agreed to roll his Third Principal Investment into a new investment.

**8235 SE 45th (Note 3-4)**

260.     After being asked to roll over his investment in 1116 NE Failing, Plaintiff received in the mail a Private Placement Memorandum (PPM 3-4) and a set of instructions asking him to sign a $20,000 Promissory Note dated April 16, 2014 and designated for 8235 SE 45th Ave. Portland, Oregon 97206 (Note 3-4).

261.     Plaintiff signed and mailed Note 3-4 back to the 5 Star Companies' office in Indiana.

262.     Note 3-4 listed 5 Star Investment Group VII, LLC as the Borrower and was signed by Earl Miller as its manager.

263.     Note 3-4 listed Metro Hones Northwest, LLC, as an additional Borrower, and was signed by Randall Palazzo as its manager.

264.     Note 3-4 provided for interest to accrue at a rate of ten percent per annum, and obligated 5 Star Investment Group VII, LLC to make thirty consecutive monthly payments of $166.66 beginning May 15, 2014.

265.     Note 3-4 also provides for the Borrower to pay all attorney's fees, paralegal's fees, and any costs and expenses incurred in its collection, and for a penalty of three percent on any payment delivered more than thirty days after the due date.

266.     Note 3-4 empowers the lender to declare all amounts owed under it immediately due in the event that the Borrower fails to pay interest.

267. Note 3-4 also asks the Lender to initial whether he is an "accredited investor" or a "sophisticated non-accredited investor" in order to comply with Securities Exchange Commission filing requirements.

268. A provision in Note 3-4 references a Private Placement Memorandum associated with the investment, and requires the Lender to acknowledge they had at least forty-eight hours to review it.

269. The Private Placement Memorandum Plaintiff received in connection with Note 3-4 is dated April 16, 2014 (PPM 3-4).

270. PPM 3-4 is for a $3,000,000 debt offering by 5 Star Investment Group VII, LLC, with a minimum investment of $15,000.

271. PPM 3-4 states that Matthew Gingerich and Earl Miller are the founders of 5 Star Investment Group VII. LLC.

272. PPM 3-4 states that Miller and Gingerich know local real estate markets and look at numerous properties before purchasing them.

273. Upon information and belief, the representation regarding Miller and Gingerich's familiarity with the real estate markets they invested in were false when made, and neither Miller nor Gingerich has any particular familiarity with Portland real estate markets.

274. PPM 3-4 states that securities will only be sold to "Accredited Investors" as defined by the Securities Act or to sophisticated non-investors.

275. Upon information and belief, the representations regarding purchasers of the securities were false when made, and Miller and Gingerich sold securities in connection

with this offering to investors who were not accredited investors nor sophisticated non-accredited investors.

276.    PPM 3-4 states that no general solicitation would be conducted, and no offering literature or advertising in any form will or may be employed in the offering of the securities.

277.    Upon information and belief, the representations regarding general solicitation and the use of advertising were false when made, and Miller, Gingerich and the 5 Star Companies did conduct a general solicitation and employed advertising.

278.    PPM 3-4 states that funds invested with 5 Star Investment Group VII, LLC would be directed to or managed by 5 Star Portland Holdings, LLC and possibly one or more other companies which will be identified before any funds are distributed.

279.    PPM 3-4 states that Miller and Gingerich will be compensated out of the company's profits.

280.    Upon information and belief, the representations regarding Miller and Gingerich's compensation were false when made, and Miller and Gingerich took payments from the company that were not real profits generated by the investments.

281.    PPM 3-4 contained no statements about a complaint by the State of Indiana against 5 Star Capital Fund, LLC for the sale of unregistered securities.

282.    Given both the interconnectedness of Miller's enterprises, and the similarity of the business practice of issuing promissory notes for fixed rate loans, the Indiana complaint was a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

283.    In making the material misrepresentations regarding Miller and Gingerich's compensation, their familiarity with the Portland real estate market, the sale of the securities to only accredited or sophisticated investors, conducting a general solicitation and employing advertising, and the existence of a complaint against 5 Star Capital, LLC for the sale of unregistered securities, Miller, Gingerich, 5 Star Investment Group VII, LLC, and 5 Star Portland Holdings, LLC acted with scienter. When they made the misrepresentations Miller and Gingerich knew or recklessly disregarded that the securities were being offered to novice investors, that they would collect payments regardless of the real profits, that they were conducting a general solicitation and employing advertising, and that they lacked familiarity with Portland real estate markets.

284.    Plaintiff was asked to roll over his Third Principal Investment to a new investment and signed a Note Satisfaction document on Note 3-4 dated February 18, 2015.

**1500 Zuider-Twin City Townhomes (Note 3-5)**

285.    After being asked to roll over his investment in 8235 SE 45th, Plaintiff received in the mail a Private Placement Memorandum and a set of instructions asking him to sign a Note Satisfaction document for Note 3-4, a $20,000 Promissory Note dated February 18, 2015 and designated for Investment I10001423 (Note 3-5).

286.    Plaintiff signed and mailed both the Note Satisfaction and Note 3-5 back to the 5 Star Companies' office in Indiana.

287.    Investment I10001283 is a property located at 1500 Zuider Winston-Salem North Carolina and known as Twin City Townhomes.

288.    Note 3-5 listed 5 Star Investment Group VII, LLC as the Borrower and was signed by Earl Miller as its manager.

289.    Note 3-5 provided for interest to accrue at a rate of ten percent per annum, and obligated 5 Star Investment Group VII, LLC to make thirty consecutive monthly payments of $166.67 beginning April 15, 2015 and one prorated payment on March 15, 2015.

290.    Note 3-5 also provides for the Borrower to pay all attorney's fees, paralegal's fees, and any costs and expenses incurred in its collection, and for a penalty of three percent on any payment delivered more than thirty days after the due date.

291.    Note 3-5 empowers the lender to declare all amounts owed under it immediately due in the event that the Borrower fails to pay interest.

292.    Note 3-5 also asks the Lender to initial whether he is an "accredited investor" or a "sophisticated non-accredited investor" in order to comply with Securities Exchange Commission filing requirements.

293.    A provision in Note 3-5 references a Private Placement Memorandum associated with the investment, and requires the Lender to acknowledge they had at least forty-eight hours to review it.

294.    The Private Placement Memorandum Plaintiff received in connection with Note 3-5 is dated April 23, 2014 (PPM 3-5).

295.    PPM 3-5 is for a $5,000,000 debt offering by 5 Star Investment Group VII, LLC, with a minimum investment of $15,000.

296.    PPM 3-5 states that securities will only be sold to "Accredited Investors" as defined by the Securities Act or to sophisticated non-investors.

297.    Upon information and belief, the representations regarding purchasers of the securities were false when made, and Miller sold securities in connection with this offering to investors who were not accredited investors nor sophisticated non-accredited investors.

298.    PPM 3-5 states that no general solicitation would be conducted, and no offering literature or advertising in any form will or may be employed in the offering of the securities.

299.    Upon information and belief, the representations regarding general solicitation and the use of advertising were false when made, and Miller and the 5 Star Companies did conduct a general solicitation and employed advertising.

300.    PPM 3-5 states that "5 Star" has partnered with a South Carolina investment firm and that together they hold assets valued at over $50,000,000.

301.    Upon information and belief, the representation regarding the assets held by 5 Star Investment Group VII, LLC was false when made, and 5 Star Investment Group VII, LLC lacks meaningful control of assets anywhere near $50,000,000.

302.    PPM 3-5 states that Earl Miller will not be paid a salary or wage of any type by the company.

303.    Upon information and belief, the representation regarding Miller's compensation was false when made, and Miller took payments from the company that were not real profits generated by the investments.

304.    PPM 3-5 states that "5 Star Investment Group is a member of an elite group of highly trained and experienced commercial and multi-family real estate professionals."

305.    Upon information and belief, the representation regarding the training and experience of 5 Star Investment Group VII, LLC was false when made, and 5 Star Investment Group VII, LLC was not a member of any group beyond Miller's own companies, much less an "elite" one, and did not employ highly trained professionals.

306.    PPM 3-5 states "[t]here may be times when the Company will hold a lien position on behalf of its Investors, instead of the Investors themselves holding such a lien position."

307.    PPM 3-5 states "[i]nvested funds are a debt due from the LLC to its Private Lenders in the form of Promissory Notes, secured by the Company's investment in properties."

308.    Upon information and belief, the representations regarding the security interest in both Note 3-5and PPM 3-5 were false when made, and no effective lien was ever acquired on the property.

309.    Upon information and belief, the deed for the property at 1500 Zuider is in the name of Twin City of Winston Salem, LLC.

310.    Upon information and belief, Twin City of Winston Salem, LLC is managed by 5 Star Commercial, LLC.

311.    Upon information and belief, 5 Star Investment Group VII, LLC, by and through Twin City Winston Salem, LLC and Earl Miller acting as Trustee of Southern Equity Group Trust assumed a mortgage on the property that was held by U.S. Bank National Association.

312.    Upon information and belief U.S. Bank National Association is the only party with a secured interest in the property at 1500 Zuider.

313.     PPM 3-5 contained no statements about the complaint by the State of Indiana against 5 Star Capital Fund, LLC for the sale of unregistered securities or the consent agreement with the State of Indiana signed by Miller in February 2015.

314.     Given both the interconnectedness of Miller's enterprises, and the similarity of the business practice of issuing promissory notes for fixed rate loans, the Indiana investigation and consent decree were material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

315.     In making the material misrepresentations regarding Miller's compensation, the company's group membership and expertise, the company's assets, the sale of the securities to only accredited or sophisticated investors, conducting general solicitation and employing advertising, the existence of a lien securing the investment, and the Indiana consent decree, Miller, 5 Star Investment Group VII, LLC, 5 Star Commercial, LLC, and Twin City Winston Salem, LLC acted with scienter. When he made the misrepresentations Miller knew or recklessly disregarded that the securities were being offered to novice investors, that he was conducting a general solicitation and employing advertising, that he would collect payments regardless of the real profits, that the company was not a member of an elite group or staffed by highly trained professionals, that he had entered into a consent decree with Indiana, that no lien was secured, and that the company did not meaningfully control $50,000,000 in assets.

316.     To date, Plaintiff has received one prorated payment of $142.24 and four payments of $166.67 in connection with Note 3-5.

317.     Plaintiff never received the payment due on August 15, 2015 under this note, or any payment thereafter.

## CLAIMS

**Count I—Fraud—Manipulative and Deceptive Devices**
**Violations of Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5**
**(Against Miller, Gingerich, and the "5 Star Corporations")**

318.    Paragraphs 1–317 are realleged and incorporated by reference.

319.    By engaging in the conduct described above, Defendants Miller, Gingerich, and their investment vehicles, the Defendants Southern Equity Group Trust, 5 Star Investment Group I, LLC, 5 Star Investment Group V LLC, 5 Star Investment Group VII, LLC, 5 Star Investment Group, LLC, 5 Star Commercial, LLC, 5 Star Portland Holdings, LLC, and Twin City of Winston Salem, LLC, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

320.    As described in more detail above, Defendants acted with scienter in that they knowingly or recklessly made the material misrepresentations and omissions and engaged in the fraudulent scheme identified above.

321.    By reason of the foregoing, Defendants Miller, Gingerich, and their investment vehicles, the Defendants Southern Equity Group Trust, 5 Star Investment Group I, LLC, 5 Star Investment Group V, LLC, 5 Star Investment Group VII, LLC, 5 Star Investment Group, LLC, 5 Star Commercial, LLC, 5 Star Portland Holdings, LLC,

and Twin City of Winston Salem, LLC violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. 240.10b-5].

### Count II—Use of Mails to Sell Unregistered Securities
### Violations of Sections 12(a)(1) of the 1933 Securities Act
### (Against Miller, Gingerich, and the "5 Star Corporations")

322.    Paragraphs 1–317 are realleged and incorporated by reference as though fully set forth herein.

323.    By engaging in the conduct described above Defendants Miller, Gingerich, and their investment vehicles, the Defendants Southern Equity Group Trust, 5 Star Investment Group I, LLC, 5 Star Investment Group V, LLC, 5 Star Investment Group VII, LLC, 5 Star Investment Group, LLC, 5 Star Commercial, LLC, 5 Star Portland Holdings, LLC, and Twin City of Winston Salem, LLC made use of the means and instruments of interstate commerce and by the use of the mails to sell unregistered securities through the use of a prospectus or otherwise.

324.    By engaging in the conduct described above, Defendants Miller, Gingerich, and their investment vehicles, the Defendants Southern Equity Group Trust, 5 Star Investment Group I, LLC, 5 Star Investment Group V, LLC, 5 Star Investment Group VII, LLC, 5 Star Investment Group, LLC, 5 Star Commercial, LLC, 5 Star Portland Holdings, LLC, and Twin City of Winston Salem, LLC caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, unregistered securities for the purpose of sale or delivery after sale.

325.    By reason of the foregoing, Defendants Miller, Gingerich, and their investment vehicles, the Defendants Southern Equity Group Trust, 5 Star Investment Group I, LLC, 5 Star Investment Group V, LLC, 5 Star Investment Group VII, LLC, 5

Star Investment Group, LLC, 5 Star Commercial, LLC, 5 Star Portland Holdings, LLC, and Twin City of Winston Salem, LLC violated Section 12(a)(1) of the Securities Act [15 U.S.C. § 77l(a)(1)].

### Count III—Use of the Mails to Make False Statements
### Violations of Section 12(a)(2) of the 1933 Securities Act
### (Against Miller, Gingerich, and the "5 Star Corporations")

326.    Paragraphs 1–317 are realleged and incorporated by reference as though fully set forth herein.

327.    By engaging in the conduct described above, Defendants Miller, Gingerich, and their investment vehicles, the Defendants Southern Equity Group Trust, 5 Star Investment Group I, LLC, 5 Star Investment Group V, LLC, 5 Star Investment Group VII, LLC, 5 Star Investment Group, LLC, 5 Star Commercial, LLC, 5 Star Portland Holdings, LLC, and Twin City of Winston Salem, LLC offered or sold securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, by means of a prospectus or oral communication including an untrue statement of material fact or omitting to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

328.    Defendants Miller, Gingerich, and their investment vehicles, the Defendants Southern Equity Group Trust, 5 Star Investment Group 1, LLC, 5 Star Investment Group V, LLC, 5 Star Investment Group VII, LLC, 5 Star Investment Group, LLC, 5 Star Commercial, LLC, 5 Star Portland Holdings, LLC, and Twin City of Winston Salem, LLC knew or could have known through the exercise of reasonable care of such untruths or omissions.

50

329. By reason of the foregoing, Defendants Miller, Gingerich, and their investment vehicles, the Defendants Southern Equity Group Trust, 5 Star Investment Group I, LLC, 5 Star Investment Group V, LLC, 5 Star Investment Group VII, LLC, 5 Star Investment Group, LLC, 5 Star Commercial, LLC, 5 Star Portland Holdings, LLC, and Twin City of Winston Salem, LLC violated Section 12(a)(2) of the Securities Act [15 U.S.C. § 77l(a)(2)].

### Count IV—Breach of Contract—State Law Claim
### 4134 N. Michigan Investment
### (Against Miller, Gingerich, 5 Star Investment Group VII, LLC,
### Metro Homes Northwest, LLC, and Dilusso Homes, LLC)

330. Paragraphs 1–317 are realleged and incorporated by reference.

331. By engaging in the conduct described above in paragraphs 178–210, by refusing to deliver the 11 outstanding payments of $458.33 due under the note associated with 4134 N. Michigan, and by refusing to return Plaintiff's principal investment of $55,500, Defendants Miller (in his personal capacity and as manager of 5 Star Investment Group VII, LLC), Gingerich (in his personal capacity), 5 Star Investment Group VII, LLC, Metro Homes Northwest, LLC and Dilusso Homes are in breach of the express terms of the promissory note.

332. As a direct and proximate result of the defendants' breach of contract described above, plaintiff suffered loss and damage.

### Count V—Breach of Contract—State Law Claim
### Twin City Townhomes Investment
### (Against Miller and 5 Star Investment Group VII, LLC)

333. Paragraphs 1–317 are realleged and incorporated by reference.

334. By engaging in the conduct described in paragraphs 285–317, by refusing to deliver the 26 outstanding payments of $166.67 due under the note associated with 1500

Zuider, and by refusing to return Plaintiff's principal investment of $20,000, Defendants Miller and 5 Star Investment Group VII, LLC are in breach of the express terms of the promissory note.

335.    As a direct and proximate result of the defendants' breach of contract described above, plaintiff suffered loss and damage.

### Count VI—Breach of Contract—State Law Claim
### 625 SE 49th Investment
### (Against Miller, 5 Star Investment Group, LLC, 5 Star Investment Group VII, LLC)

336.    Paragraphs are 1–317 realleged and incorporated by reference.

337.    By engaging in the conduct described in paragraphs 127–159, by refusing to deliver the 30 outstanding payments of $416.67 due under the note associated with 625 SE 49th, and by refusing to return Plaintiff's principal investment of $50,000, Defendants Miller, 5 Star Investment Group, LLC and 5 Star Investment Group VII, LLC are in breach of the express terms of the promissory note.

338.    As a direct and proximate result of the defendants' breach of contract described above, plaintiff suffered loss and damage.

### Count VII—Breach of Contract—State Law Claim
### 8235 SE 45th Investment
### (Against Miller, 5 Star Investment Group VII, LLC and Metro Homes Northwest, LLC)

339.    Paragraphs are 1–317 realleged and incorporated by reference.

340.    By engaging in the conduct described in paragraphs 260–285, Defendant Metro Homes Northwest failed to provide consideration to modify the note associated with 8235 SE 45th and release it from its obligations.

341. By engaging in the conduct described in paragraphs 260–285, Defendants Miller and 5 Star Investment Group VII, LLC, failed to provide consideration or provided only illusory consideration to modify the note associated with 8235 SE 45th and release them from their obligations

342. By engaging in the conduct described in paragraphs 260–285, and by refusing to deliver the 26 outstanding payments of $166.67 due under the note, and by refusing to return Plaintiff's $20,000 principal, Defendants Miller, 5 Star Investment Group VII, LLC, and Metro Homes Northwest, LLC are in breach of the express terms of the promissory note.

343. As a direct and proximate result of the defendants' breach of contract described above, plaintiff suffered loss and damage.

### Count VIII—Breach of Fiduciary Duty—Illinois Law
### (Against Miller and Gingerich)

344. Paragraphs are 1–317 realleged and incorporated by reference.

345. Defendant Miller, as manager of 5 Star Investment Group VII, LLC, owed a fiduciary duty to the Plaintiff.

346. Defendant Miller breached his fiduciary duty the Plaintiff and profited as a direct result of his breach through repeated misrepresentations and by misappropriating investment funds.

347. Defendant Gingerich, as manager of 5 Star Investment Group VII, LLC, owed a fiduciary duty to the plaintiff.

348.     Defendant Gingerich breached his fiduciary duty the Plaintiff and profited as a direct result of his breach through repeated misrepresentations and by misappropriating investment funds.

### Count IX—Common Law Fraud—Illinois Law
### (Against Metro Homes Northwest, LLC, Dilusso Homes, Miller, Gingerich, and the "5 Star Corporations")

349.     Paragraphs are 1–317 realleged and incorporated by reference.

350.     As described in more detail above, the Defendants Miller, Gingerich, and their investment vehicles, the Defendants Southern Equity Group Trust, 5 Star Investment Group I, LLC, 5 Star Investment Group V, LLC, 5 Star Investment Group VII LLC, 5 Star Investment Group, LLC, 5 Star Commercial, LLC, 5 Star Portland Holdings, LLC, and Twin City of Winston Salem, LLC made false statements of material fact about the security interests associated with Plaintiff's investments, the magnitude of the assets controlled by the companies, the nature of Miller and Gingerich's compensation, the nature of the ultimate investments made by the companies, and omitted to state a material fact by not informing Plaintiff about an investigation by the State of Indiana into one of Miller's companies and the consent agreement reached by them.

351.     As described in more detail above, Defendants acted with scienter in that they knowingly or recklessly made the material misrepresentations and omissions and engaged in the fraudulent scheme identified above.

352.     As described in more detail above in Paragraphs 178–210 Defendants Metro Homes Northwest, LLC and Dilusso Homes, LLC made false statements of material fact about the investment in 4134 N. Michigan being secured by that same property, and the repayment of the principal owed upon its sale.

353.    As described in more above, Defendants acted with scienter in that they knowingly or recklessly made the material misrepresentations and omissions and engaged in the fraudulent scheme identified above.

354.    All of the Defendants intended their false statements to induce the Plaintiff to act, and the Plaintiff acted in reliance upon the truth of those statements.

355.    The Plaintiff suffered damages resulting from his reliance on the Defendants' false statements.

### Count X—Constructive Fraud—Illinois Law
### (Against Dilusso Homes, Metro Homes Northwest LLC, Miller, Gingerich, and the "5 Star Corporations")

356.    Paragraphs 1–317 are realleged and incorporated by reference.

357.    By engaging in the conduct described above, the actions of the Defendants Miller, Gingerich, and their investment vehicles, the Defendants Southern Equity Group Trust, 5 Star Investment Group I, LLC, 5 Star Investment Group V, LLC, 5 Star Investment Group VII, LLC, 5 Star Investment Group, LLC, 5 Star Commercial, LLC, 5 Star Portland Holdings, LLC, and Twin City of Winston Salem, LLC tended to deceive others to the detriment of the public interest and to private and public confidences.

358.    By engaging in the conduct described above in Paragraphs 159–182, Defendants Metro Homes Northwest, LLC and Dilusso Homes, LLC, participated in, knowingly or negligently, in the constructive fraud perpetrated on Plaintiff.

359.    The Defendants' relationships, business practices and the surrounding circumstances of their dealing gave rise to a constructive fraud perpetrated on the Plaintiff.

**Count XI—Fraud —Illinois Law**
**Violations of Section 12 of the Illinois Securities Law of 1953**
**(Against Miller, Gingerich, and the "5 Star Corporations")**

360.    Paragraphs 1–317 are realleged and incorporated by reference.

361.    By engaging in the conduct described above, Defendants Miller, Gingerich, and their investment vehicles, the Defendants Southern Equity Group Trust, 5 Star Investment Group I, LLC, 5 Star Investment Group V, LLC, 5 Star Investment Group VII, LLC, 5 Star Investment Group, LLC, 5 Star Commercial, LLC, 5 Star Portland Holdings, LLC, and Twin City of Winston Salem, LLC, in connection with the purchase and sale of securities, engaged in transactions, practices, and courses of business that tended to work a fraud or deceit upon the purchaser.

362.    By engaging in the conduct described above, Defendants Miller, Gingerich, and their investment vehicles, the Defendants Southern Equity Group Trust, 5 Star Investment Group I, LLC, 5 Star Investment Group V, LLC, 5 Star Investment Group VII, LLC, 5 Star Investment Group, LLC, 5 Star Commercial, LLC, 5 Star Portland Holdings, LLC, and Twin City of Winston Salem, LLC, obtained money or property through the sale of securities, by means of untrue statements of material fact or omitting to state a material fact in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

363.    By engaging in the conduct described above, Defendants Miller, Gingerich, and their investment vehicles, the Defendants Southern Equity Group Trust, 5 Star Investment Group I, LLC, 5 Star Investment Group V, LLC, 5 Star Investment Group VII, LLC, 5 Star Investment Group, LLC, 5 Star Commercial, LLC, 5 Star Portland Holdings, LLC, and Twin City of Winston Salem, LLC, signed or circulated statements,

56

prospectuses or other documents pertaining to securities knowing or having reasonable grounds to know that any material representation therein contained to be false or misleading.

364.    By engaging in the conduct described above Defendants Miller, Gingerich, and their investment vehicles, the Defendants Southern Equity Group Trust, 5 Star Investment Group I, LLC, 5 Star Investment Group V, LLC, 5 Star Investment Group VII, LLC, 5 Star Investment Group, LLC, 5 Star Commercial, LLC, 5 Star Portland Holdings, LLC, and Twin City of Winston Salem, LLC, employed a device, scheme or artifice, directly or indirectly, to defraud in connection with the purchase or sale of securities.

365.    As described in more detail above, Defendants acted with scienter in that they knowingly or recklessly made the material misrepresentations and omissions and engaged in the fraudulent scheme identified above.

366.    By reason of the foregoing, Defendants Miller, Gingerich, and their investment vehicles, the Defendants Southern Equity Group Trust, 5 Star Investment Group I, LLC, 5 Star Investment Group V, LLC, 5 Star Investment Group VII, LLC, 5 Star Investment Group, LLC, 5 Star Commercial, LLC, 5 Star Portland Holdings, LLC, and Twin City of Winston Salem, LLC violated Sections 12(F)–(I) of the Illinois Securities Act [815 ILCS 5/12(F)–(I)].

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff William Adamczyk respectfully requests that this court enter a judgment in his favor against Defendants Earl D. Miller, Matthew Gingerich, Southern Equity Group Trust, 5 Star Investment Group I, LLC, 5 Star Investment Group

V, LLC, 5 Star Investment Group VII, LLC, 5 Star Investment Group, LLC, 5 Star

Commercial, LLC, 5 Star Portland Holdings, LLC, Twin City of Winston Salem, LLC,

Metro Homes Northwest, LLC, and Dilusso Homes, LLC, awarding compensatory

damages in the amount of $145,537.00, attorneys' fees, and costs against each Defendant,

punitive damages against Defendants Matthew Gingerich and Earl D. Miller individually

and against the Defendant Corporations controlled by them, and any other relief this

Court deems just and appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff requests

a trial by jury.

**January 14, 2015**          /s/ J. Samuel Tenenbaum____

J. Samuel Tenenbaum
Joseph Delich – JD Candidate 2016 (No. 2015LS00190)
Bluhm Legal Clinic
Northwestern University School of Law
375 E. Chicago Avenue, Chicago, Illinois 60611
(312) 503-4808 (telephone)
(312) 503-8777 (facsimile)
s-tenenbaum@law.northwestern.edu
j-delich2016@nlaw.northwestern.edu
*Attorney and Representative for William Adamczyk*