# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| William Adamczyk | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | Case No. 16-cv-516 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| Earl D. Miller, | ) | |
| Matthew Gingerich, | ) | Magistrate Judge Jeffrey T. Gilbert |
| 5 Star Investment Group I, LLC | ) | |
| 5 Star Investment Group V, LLC, | ) | |
| 5 Star Investment Group VII, LLC, | ) | |
| 5 Star Investment Group, LLC, | ) | |
| 5 Star Commercial, LLC, | ) | |
| 5 Star Portland Holdings, LLC, | ) | |
| Twin City of Winston Salem, LLC, | ) | |
| Southern Equity Group Trust, | ) | |
| Metro Homes Northwest, LLC, and | ) | |
| Dilusso Homes, LLC | ) | |
| | ) | |
| Defendants | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS AND TRANSFER

J. Samuel Tenenbaum
Joseph Delich – JD Candidate 2016
(No. 2015LS00190)
Bluhm Legal Clinic
Northwestern University School of Law
375 E. Chicago Avenue
Chicago, Illinois 60611
(312) 503-4808 (telephone)
(312) 503-8777 (facsimile)
s-tenenbaum@law.northwestern.edu
j-delich2016@nlaw.northwestern.edu
*Counsel for William Adamczyk*

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................................... ii

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

    I.    Gingerich was Intimately Involved in the Fraudulent Enterprise of the 5 Star
Companies. .......................................................................................................................... 2

    II.    This Court Has Personal Jurisdiction Over Defendant Gingerich Because the
Minimum Contacts of the 5 Star Companies are Attributable to Him. .......................... 4

        A.    Legal Standard ................................................................................................. 4

        B.    The Minimum Contacts of a Corporation are Attributable to Nonresident
Defendants when the Company Acted as their Agent or was Operated as an
Alter Ego. .................................................................................................................... 5

        D.    The 5 Star Companies were the Alter Egos of Defendants Miller and
Gingerich. .................................................................................................................... 8

    III.    Defendant's Motion to Dismiss for Failure to State a Claim Should Be Denied
in its Entirety. .................................................................................................................... 14

        A.    Legal Standard–Rule 9(b) and the PSLRA ................................................. 14

        B.    Plaintiff Properly Stated a Claim for Fraud (Counts I–III & VIII–XI). ........... 16

        C.    Plaintiff Properly Stated a Claim Under Section 12 of the 1933 Securities
Act (Counts II & III). ................................................................................................ 21

        D.    Plaintiff Properly Stated a Claim for Breach of Fiduciary Duty and
Constructive Fraud (Counts VIII and X) ................................................................. 23

        E.    Plaintiff has Properly Stated a Claim for Breach of Contract (Count IV). ...... 24

    IV.    The Northern District of Illinois is the Appropriate Venue. ................................. 26

        A.    Legal Standard ............................................................................................... 26

        B.    A Venue Transfer Does Not Serve Convenience. ....................................... 26

        C.    A Venue Transfer Does Not Serve Justice. ................................................. 29

CONCLUSION ..................................................................................................................... 30

# TABLE OF AUTHORITIES

**Federal Cases**

*Abbott Labs., Inc. v. BioValve Techs., Inc.*, 543 F. Supp. 2d 913 (N.D. Ill. 2008) .4

*ABN AMRO, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d 805 (N.D. Ill. 2008)4, 5, 22

*AFP Imaging Corp. v. Ross*, 780 F.2d 202, 204 (2d Cir. 1985) .............................5

*AL & PO Corp. v. Am. Healthcare Capital, Inc.*, 2015 WL 738694
 (N.D. Ill. Feb. 19, 2015) ...................................................................................27

*Amakua Dev. LLC v. Warner*, 411 F. Supp. 2d 941 (N.D. Ill. 2006) ..............14, 15

*Anetsberger v. Metropolitan Life Insurance Co.,* 14 F.3d 1226 (7th Cir.1994)......5

*Babchuk v. Indiana Univ. Health, Inc.,* 299 F.R.D. 591 (S.D. Ind. 2014) ..............7

*Browning–Ferris Indus. of Ill., Inc. v. Ter Maat,* 195 F.3d 953 (7th Cir.1999)....10

*Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr.*, 536 F.3d 757 (7th Cir. 2008)....4

*Coffey v. Van Dorn Iron Works*, 796 F.2d 217 (7th Cir. 1986)............................26

*Cont'l Cas. Co. v. Symons*, No. 14-2665, 2016 WL 1118566
(7th Cir. Mar. 22, 2016).................................................................................18, 19

*Daniels v. Blount Parrish & Co.*, 113 F. App'x 174 (7th Cir. 2004)....................21

*Desai v. Gen. Growth Properties, Inc.*, 654 F. Supp. 2d 836 (N.D. Ill. 2009)......17

*Firstar Bank, N.A. v. Faul Chevrolet, Inc.*, 249 F. Supp. 2d 1029
(N.D. Ill. 2003) ................................................................................................10

*First Nat. Bank v. El Camino Res., Ltd.*, 447 F. Supp. 2d 902
(N.D. Ill. 2006) ................................................................................................30

*In re Teknek, LLC*, 354 B.R. 181, 195 (Bankr. N.D. Ill. 2006) ............................13

*Interlease Aviation Investors II (Aloha) L.L.C. v. Vanguard Airlines, Inc.,*
262 F.Supp.2d 898 (N.D. Ill. 2003).....................................................................4

*Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.,* 356 F.3d 731
(7th Cir. 2004) ...................................................................................................6

*Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321 (7th Cir. 1994) ................................21

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371
(7th Cir. 2008) ............................................................................................... 7

*Labella Winnetka, Inc. v. Gen. Cas. Ins. Co.*, 259 F.R.D. 143 (N.D. Ill. 2009) ...... 7

*Lee v. Love's Travel Stops & Country Stores, Inc.*, No. 15-CV-7774, 2015 WL 6742074,
(N.D. Ill. Nov. 3, 2015) ............................................................... 26, 27, 30

*Liska v. Dart*, 60 F. Supp. 3d 889 (N.D. Ill. 2014) ................................................ 7

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702
(7th Cir. 2008) .................................................................... 15, 16, 17, 19

*Moore v. AT & T Latin America Corp.*, 177 F. Supp. 2d 785
(N.D. Ill. 2001) ............................................................................................. 28

*Nathan v. Morgan Stanley Renewable Dev. Fund, LLC*, No. 11 C 2231,
2012 WL 1886440 (N.D. Ill. May 22, 2012) .......................................................... 6

*PharMerica Chicago, Inc. v. Meisels*, 772 F. Supp. 2d 938 (N.D. Ill. 2011) ....... 24

*Pinter v. Dahl*, 486 U.S. 622 (1988) ............................................................... 21

*Plotkin v. IP Axess, Inc.*, 168 F. Supp. 2d 899 (N.D. Ill. 2001) .......................... 26

*RehabCare Grp. E., Inc. v. SAK Mgmt. Servs., LLC*, 2010 WL 3307084
 (N.D. Ill Aug. 18, 2010) ............................................................................... 14

*Rice v. Nova Biomedical Corp.*, 38 F.3d 909 (7th Cir. 1994) ................................ 5

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953) ............................................... 22

*Starr v. !Hey, Inc.*, 2003 WL 21212596 (N.D. Ill. May 23, 2003) ........................ 21

*Taylor v. Midland Funding, LLC*, 94 F. Supp. 3d 941 (N.D. Ill. 2015) ............... 28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ...................... 15

*U.S. Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.*,
No. 07 C 3598, 2008 WL 4299771 (N.D. Ill. Sept. 17, 2008) ........................... 5, 9

*United States v. Coffman*, 94 F.3d 330 (7th Cir. 1996) ...................................... 20

*Vandeveld v. Christoph*, 877 F. Supp. 1160 (N.D. Ill. 1995) ............................... 26

*Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743
(7th Cir. 2012) .................................................................................. 12, 18

*Winer Family Trust v. Queen*, 503 F.3d 319 (3d Cir. 2007) ............................... 17

iv

*YKK USA, Inc. v. Baron*, 976 F. Supp. 743 (N.D. Ill. 1997) ..........................5, 6, 9

**State Cases**

*Fontana v. TLD Builders, Inc.,* 362 Ill.App.3d 491, 298 Ill.Dec. 654, 840 N.E.2d 767 (Ill.App.Ct.2005) ......................................................................................7

*Old Orchard Urban Ltd. P'ship v. Harry Rosen, Inc.,* 904 N.E.2d 1050, 389 Ill.App.3d 58 (Ill. App. Ct. 2009) ....................................................................6

*Ted Harrison Oil Co. v. Dokka*, 247 Ill. App. 3d 791, 617 N.E.2d 898 (1993) ....12

**Federal Statutes**

Private Securities Litigation Reform Act (PSLRA) .........................................1, 15

15 U.S.C. § 78u–4(b)(2) ......................................................................................15

**State Statutes**

740 ILCS § 160/3(a)-(b) ........................................................................................24

**Federal Rules**

Federal Rule of Civil Procedure 9(b) .........................................................1, 14,15

**Regulations**

17 C.F.R. § 230.502....................................................................................22, 23

17 C.F.R. § 230.506....................................................................................23

**Other Authorities**

1 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 30 ....................................................................................5

Ill. Sup. Ct. Rule 711 ..........................................................................................28

Ind. R. of Court 2.1 ..............................................................................................28

## INTRODUCTION

Plaintiff William Adamczyk, by his undersigned attorneys, provides the following Response in Opposition to the Motions to Dismiss for Lack of Personal Jurisdiction, for Failure to State a Claim, and to Transfer Venue filed by Defendant Matthew Gingerich.

There is no question in this case that Mr. Adamczyk was defrauded. The essence of Mr. Gingerich's motion to dismiss is that he had nothing to do with it because his role in the 5 Star Companies was merely "operational," and because he had disassociated with the 5 Star Companies before Mr. Adamczyk's money disappeared. But it is precisely the "operations" of the 5 Star Companies and the misappropriation of funds like the payment to Gingerich that deprived Mr. Adamczyk of his life savings.

Gingerich attempts to transform his blanket denial into a legal argument primarily by invoking the pleading requirements of Rule 9(b), the PSLRA, and the "group pleading" doctrine. His arguments must be rejected because Plaintiff's allegations contain a wide range of particular statements and conduct attributable to Gingerich either directly, through principal-agent relationships, or through the alter ego doctrine. Gingerich's attempts to evade the obvious conclusion rest heavily on the reality that Plaintiff's already detailed complaint was not even more detailed because of the Defendants' exclusive control of certain information. For example, Gingerich does not deny a role in creating the documents associated with the securities offerings, in his affidavit or elsewhere, but he is quick to point out Plaintiff has not alleged the specific roles played by himself and Miller in their creation.

This is hardly surprising given the strong evidence Plaintiff does have in his possession supporting Gingerich's level of involvement in the 5 Star Companies' fraud.

Even though Gingerich claims Miller was responsible for advertising, Gingerich himself appeared in multiple advertisements for the company, including a video advertisement relied on by Plaintiff before making his initial investment, and billboards in Indiana. *See* Exhibits A, B, & D. Gingerich's name also appears on SEC filings for registration exemptions under Rule 506, suggesting an integral role in the conduct constituting myriad securities violations. Exhibits M & R; Exhibits L & T (listing "Matt Gergich" who is presumably Defendant Gingerich). Miller has also testified under oath in the related bankruptcy that Gingerich controlled all of the books, and that he paid Gingerich $1.5 million dollars in response to a demand by Gingerich. Exhibit W- Tr. 341 Creditor Meeting at 72–73. The bankruptcy trustee also claims to be in possession of a document drafted by either Miller or Gingerich admitting that companies were formed to evade registration requirements. Exhibit U at 6. Finally, Plaintiff has in his possession a promissory note with a signed personal guaranty from Gingerich. Compl. ¶ 182.

Though it takes many forms, there is one simple theme throughout this Response. There never were any 5 Star Companies at all. There was only ever Earl Miller, Matthew Gingerich, and the money they swindled, squandered, and stole. Defendant's motions should be denied in their entirety.

## ARGUMENT

### I. Gingerich was Intimately Involved in the Fraudulent Enterprise of the 5 Star Companies.

Gingerich's affidavit states the Miller was responsible for advertising, and essentially disavows any involvement in investor relations. Gingerich Aff. ¶¶ 20, 27–28. There is reason to be skeptical of this claim. Prior to investing, Plaintiff viewed a Youtube video describing the 5 Star business strategy. Exhibit A. A photograph of

Gingerich appears in the video, and he is identified by name. Exhibit B. The video is rife with misrepresentations, the most egregious of which is a graphic depicting "How the Multi-Family Investment Strategy Works" Exhibit C. Of the nine sections in the wheel graphic, at least six of them are untrue misrepresentations. 5 Star did not provide bank loans, it did not assume management of the apartment complexes, its payments to investors were never contingent on positive cash flows, it never shared cash flow from tenants with investors, it never made improvements to properties, and it never shared profits with investors.

The video narration also claims that investments are "secured with tangible real estate assets" Exhibit A. The single family home description essentially admits that they solicited investors, since the first step listed is that "5 Star Contacts Investor with Opportunity." Exhibit C. At no point is there a disclaimer of any kind, though it does describe the investment strategy as a "win-win" opportunity. Exhibit A. Plaintiff has also attached a December 2013 photograph of a billboard advertisement near Middlebury, Indiana, which also includes a photograph of Mr. Miller. Exhibit D. The notion that Mr. Gingerich was somehow not only uninvolved, but actually unaware of the enterprise's fraud strains credulity.

In his affidavit, Mr. Gingerich did admit to being responsible for "operations," yet it is never explained why this distances him from the creation of the securities offerings, the misappropriation of investor funds, or why he would be involved enough to sign Plaintiff's promissory note but not involved enough to be aware of the misrepresentations required to induce Plaintiff to accept it.

## II. This Court Has Personal Jurisdiction Over Defendant Gingerich Because the Minimum Contacts of the 5 Star Companies are Attributable to Him.

### A. Legal Standard

While the Plaintiff has the burden of demonstrating personal jurisdiction, "all reasonable inferences consistent with the complaint" are drawn in the plaintiff's favor. *ABN AMRO, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 818 (N.D. Ill. 2008). A plaintiff is only required to make a prima facie showing of personal jurisdiction, but upon the submission of evidence or affidavits by a defendant, a plaintiff is required to go beyond the pleadings and submit affirmative evidence. *ABN AMRO, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 818 (N.D. Ill. 2008). In considering the evidence, "[a]ny conflicts in the pleadings and affidavits are to be resolved in the plaintiffs' favor, but the court accepts as true any facts contained in the defendants' affidavits that remain unrefuted by the plaintiffs." *Id.* (quoting *Interlease Aviation Investors II (Aloha) L.L.C. v. Vanguard Airlines, Inc.,* 262 F.Supp.2d 898, 904 n. 3 & 905 (N.D. Ill. 2003)) (quotation marks omitted). An exercise of specific personal jurisdiction is appropriate when a defendant has created minimum contacts giving rise to the claim by purposefully directing activities at the forum state, or purposefully availing themselves of the privilege of doing business in the state. *Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr.*, 536 F.3d 757, 761 (7th Cir. 2008). The minimum contacts analysis is not "mechanical or quantitative," and in the context of a contract requires consideration of the negotiations, contemplated consequences, the terms of the contract, and the actual course of dealing between the parties. *Id.* at 761-62. While the mere existence of a contract is not dispositive for establishing minimum contact, neither is a defendant's physical absence

from the forum state. *See e.g.*, *Abbott Labs., Inc. v. BioValve Techs., Inc.*, 543 F. Supp. 2d 913, 920, 924 (N.D. Ill. 2008).

### B. The Minimum Contacts of a Corporation are Attributable to Nonresident Defendants when the Company Acted as their Agent or was Operated as an Alter Ego.

The Illinois long arm statute expressly authorizes the attribution of an agent's minimum contacts to the principal. *ABN AMRO, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 821 (N.D. Ill. 2008). In order to bind the principal, an "agent must have either actual or apparent authority, or the principal must ratify the agent's unauthorized actions." *ABN AMRO, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 821 (N.D. Ill. 2008) (citing *Anetsberger v. Metropolitan Life Insurance Co.,* 14 F.3d 1226, 1234 (7th Cir.1994)).

In Illinois, agents are protected by the "fiduciary shield" doctrine, which "denies personal jurisdiction over an individual whose presence and activity in the state in which the suit is brought were solely on behalf of his employer or other principal." *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 912 (7th Cir. 1994). The "fiduciary shield doctrine is inapplicable if a defendant's actions were taken to further his or her personal interests." *U.S. Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.*, No. 07 C 3598, 2008 WL 4299771, at *5-6 (N.D. Ill. Sept. 17, 2008).

Corporations ordinarily do not act in an agent capacity, but its "shareholders may involve the corporation in their own business affairs to such an extent as to constitute it their agent." *AFP Imaging Corp. v. Ross*, 780 F.2d 202, 204 (2d Cir. 1985); 1 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 30. Similarly, a corporation's actions can be attributed to individuals when a corporation is a mere "alter ego" or sham, which allows the corporate veil to be pierced. *YKK USA, Inc. v.*

*Baron*, 976 F. Supp. 743, 747 (N.D. Ill. 1997). When a corporation is a mere alter ego, the fiduciary shield doctrine no longer applies, and the "corporation's contacts are attributed to the individual for the purposes of personal jurisdiction determination." *YKK USA, Inc. v. Baron*, 976 F. Supp. 743, 747 (N.D. Ill. 1997).

In Illinois, "efforts to piece the corporate veil are governed by the state of incorporation." *Old Orchard Urban Ltd. P'ship v. Harry Rosen, Inc.,* 904 N.E.2d 1050, 1060–61, 389 Ill.App.3d 58 (Ill. App. Ct. 2009). However, "[w]hen a party uses veil piercing to establish personal jurisdiction, Illinois law governs the analysis." *Nathan v. Morgan Stanley Renewable Dev. Fund, LLC*, No. 11 C 2231, 2012 WL 1886440, at *7-8 (N.D. Ill. May 22, 2012) (citing *Old Orchard Urban Ltd. P'ship v. Harry Rosen, Inc.,* 904 N.E.2d 1050, 1061, 389 Ill.App.3d 58 (Ill. App. Ct. 2009)).

While courts are reluctant to pierce the corporate veil for substantive claims, a plaintiff can satisfy the exception to establish personal jurisdiction with only a "minimally viable showing that the corporation is a sham." *YKK USA, Inc. v. Baron*, 976 F. Supp. 743, 747–48 (N.D. Ill. 1997) (internal quotation marks omitted) (listing cases where allegations were sufficient).

The Illinois alter ego analysis requires a showing "that (1) there is such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances are such that adhering to the fiction of a separate corporate existence would promote *injustice or inequity.*" *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.,* 356 F.3d 731, 736 (7th Cir. 2004) (internal quotations and citations omitted). Illinois courts consider the following eleven factors to determine whether sufficient unity of interest exists for piercing the veil:

(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders.

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008) (citing *Fontana v. TLD Builders, Inc.,* 362 Ill.App.3d 491, 298 Ill.Dec. 654, 840 N.E.2d 767, 778 (Ill.App.Ct.2005)).

### C. The 5 Star Companies' Minimum Contacts are Undisputed.

As an initial matter, Defendant Gingerich has not challenged the existence of personal jurisdiction over the 5 Star Companies based on their dealings with Plaintiff as described in the Complaint. By failing to raise this argument in his Motion to Dismiss, Defendant Gingerich has waived it, and the only question properly before the Court is whether those minimum contacts are properly attributed to Gingerich. *See Liska v. Dart*, 60 F. Supp. 3d 889, 900 (N.D. Ill. 2014) ("[I]t is well-established that arguments raised for the first time in [a] reply brief are waived.") (internal quotation marks omitted); *Babchuk v. Indiana Univ. Health, Inc.,* 299 F.R.D. 591, 594 (S.D. Ind. 2014) ("Defendants waived any argument that dismissal is proper under Rule 12(b)(6) by raising it for the first time in their reply brief."); *Labella Winnetka, Inc. v. Gen. Cas. Ins. Co.,* 259 F.R.D. 143, 147 (N.D. Ill. 2009) ("[The Defendant] raises the argument only in its reply brief; therefore, the argument is not properly before the Court.").

Plaintiff has made a prima facie showing of sufficient minimum contacts to establish personal jurisdiction over Matthew Gingerich, Earl Miller, and the entities

controlled by them. Miller, Gingerich and their entities purposefully and repeatedly availed themselves of the privilege of doing business in the state of Illinois. Plaintiff was introduced to the 5 Star Companies by his brother as part of a referral program initiated by the 5 Star Companies, a program that called existing lenders and encouraged them to bring in new lenders. Compl. ¶¶ 47–48. Plaintiff traveled only once to Indiana to meet with a 5 Star employee, and subsequently called their office to initiate his first investment. *Id.* at ¶¶ 48-49. In response, the 5 Star Companies express mailed documents to Plaintiff's home in Illinois, including instructions for wiring funds to the company. *Id.* at ¶ 49. All further business, including interest payments and signing of additional promissory notes, was conducted via phone and mail to Plaintiff's home in Illinois. *Id.* at ¶¶ 50-58. The 5 Star Companies called Plaintiff to initiate rollovers of these principal investments into ten different properties. *Id.* For over two years following his initial introduction to the 5 Star Companies, all negotiations and business dealings between Plaintiff and the 5 Star Companies were done at Plaintiff's home in Illinois via phone and mail, and primarily initiated by 5 Star Company employees. The terms of the promissory notes lists Plaintiff's Illinois address, and it grants broad rights to Plaintiff to pursue collection of the note. (Exhibit B at 1) ("Borrower waives presentment for payment, protest, notice of protest, notice of non-payment or dishonor of this Note, and diligence in the collection of this Note[.]"). The broad collection rights and the absence of a competing choice of law provision support the foreseeability of Plaintiff haling the 5 Star Companies and their co-venturers into court in Illinois.

**D. The 5 Star Companies were the Alter Egos of Defendants Miller and Gingerich.**

The minimum contacts of the 5 Star Companies are properly attributed to Defendants Miller and Gingerich under the alter ego exception to the fiduciary shield. This is not a hard case, and the exception is easily established. Indeed, this case is practically a "poster child for the transaction of business through a maze of interrelated companies" that were under common control, did not operate at arms length, and served the primary purpose of illegally enriching the two people exercising that control. *U.S. Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.*, No. 07 C 3598, 2008 WL 4299771, at *5-6 (N.D. Ill. Sept. 17, 2008). Plaintiff could likely prevail by limiting allegations in his Complaint to those that implicate only a few of the Illinois factors that support a "unity of interest" characteristic of an alter ego corporation. *See, e.g.*, *YKK USA, Inc. v. Baron*, 976 F. Supp. 743, 747–48 (N.D. Ill. 1997) (listing cases). Plaintiff's Complaint goes much farther than this, and includes allegations that implicate virtually all of the applicable factors.

The 5 Star Companies were inadequately capitalized. Most of them are insolvent and have declared bankruptcy under Chapter 11 since Plaintiff filed his complaint. *In re 5 Star Investment Group, LLC*, No. 16-30078 (Bankr. N.D. Ind. 2016) (consolidating the bankruptcy petitions of 5 Star Investment Group, LLC, 5 Star Investment Group V, LLC, 5 Star Investment Group VII, LLC, 5 Star Portland Holdings, LLC, and 5 Star Commercial, LLC). The lawsuit filed by Metro Homes Northwest, LLC against some of the 5 Star Companies provides further evidence of inadequate capitalization by detailing 5 Star's failure to fund draw requests and fulfill their obligations. Ex. V-*Metro Homes Northwest, LLC v. 5 Star Investment Group, LLC et al.*, No. 15-cv-01680 (D. Or. 2015) (Dkt. No. 1). Plaintiff's Complaint does not include the words "inadequately

capitalized," but it does contain numerous allegations concerning the 5 Star Companies' failure to make interest payments. *See, e.g.*, Compl. at ¶ 74. Plaintiff's Complaint also describes a letter from Earl Miller revealing that sixteen different 5 Star Corporations were experiencing a "very tight cash-flow situation," which would clearly be the result of inadequate capitalization. Compl. at ¶¶ 79–82. Plaintiff's Complaint also alleges that this letter referred to an improper payment to Gingerich as the cause of the financial problems. *Id.* A corporation is inadequately capitalized when it has "so little money that it could not and did not actually operate its nominal business on its own[.]" *Firstar Bank, N.A. v. Faul Chevrolet, Inc.*, 249 F. Supp. 2d 1029, 1041 (N.D. Ill. 2003) (quoting *Browning–Ferris Indus. of Ill., Inc. v. Ter Maat,* 195 F.3d 953, 961 (7th Cir.1999) (internal quotation marks omitted). Even if the payment to Gingerich was proper, which it was not, the fact that it rendered the 5 Star Companies unable to operate would still be strongly indicative of businesses incapable of running on their own, and that 5 Star Company bank accounts amounted to little more than the personal accounts of Gingerich and Miller.

The 5 Star Companies failed to observe corporate formalities, and there is an absence of corporate records. Exhibit U-Trustee Mot. for Substantive Consolidation at 16, Dkt. 272, *5 Star Investment Group, LLC*, Case No. 16-30078 (Bankr. N.D. Ind.) (May 17, 2016). Most evidence of the failure to observe corporate formalities is necessarily in the exclusive control of the Defendants, but publicly available documents filed by the 5 Star Companies with the Securities and Exchange Commission indicate that record keeping and compliance with corporate formalities were haphazard at best. For example, a search of the term "5 Star" returns filings for some of the companies, but not

others.  More specifically, filings were made on behalf of 5 Star Capital Fund, LLC; 5

Star Fund I, LLC; 5 Star Fund II, LLC; 5 Star Holdings, LLC; 5 Star Indiana Holdings,

LLC; 5 Star Investing, LLC; 5 Star Investment Groups II, III, IV, VII, and XI;  and 5 Star

Portland Holdings.  Exhibit E.  Notably, there are no filings on behalf of 5 Star

Investment Group, LLC, 5 Star Investment Group I, LLC, 5 Star Investment Group V,

LLC, or 5 Star Commercial, LLC. *See* Exhibits F–T.

One filing for 5 Star Investment Group VII, LLC claimed an exemption under

Rule 506(b), but listed the current number of investors as 38 which blatantly exceeds the

limitation on the number of purchasers imposed by the rule. Exhibit Q; 17 C.F.R.

§ 230.506(b)(2)(i) ("There are no more than or the issuer reasonably believes that there

are no more than 35 purchasers of securities from the issuer in any offering under this

section.").  The existence of filings on behalf of both 5 Star Investment Group VII, LLC

and 5 Star Portland Holdings, LLC is highly indicative of integration that violates 17

C.F.R. § 230.502 since the sales were part of a single plan of financing, involve the same

class of securities, and would be for the same general purpose.

Only two companies filed pursuant to Rule 506(c): 5 Star Investing, LLC and 5

Star Investment Group II, LLC. Exhibits M–N.  Because every other offering was

pursuant to Rule 506(b), they were prohibited from conducting general solicitation or

general advertising.  17 C.F.R. § 230.502(c); Exhibits F–T.  The 5 Star Companies

clearly failed to implement any formal system to try and honor this distinction, as

demonstrated by the fact they regularly advertised on billboards, television and the

internet to solicit investors for 5 Star Investment Group, LLC.  *See, e.g.*, Compl. at ¶¶ 4,

8, 48.  The letter from Miller about cash flow problems is further evidence that

recordkeeping was insufficient or nonexistent. Compl. at ¶¶ 79–82. *See Ted Harrison Oil Co. v. Dokka*, 247 Ill. App. 3d 791, 796, 617 N.E.2d 898, 902 (1993) (finding lack of corporate formalities where "[n]o records were kept and the company did not hold formal shareholder or director meetings.").

The 5 Star Companies also commingled funds. Compl. at ¶ 82. Most of the evidence of commingling is necessarily in the exclusive control of the Defendants. But it is indisputable that funds raised in offerings by one company were often immediately transferred to another, and Miller's letter identifying "cash flow" problems uniformly affecting sixteen different companies, and the large buy out of Gingerich precipitating the problems are all highly characteristic of commingled assets. Compl. ¶¶ 22, 42, 76–82, 117, 180, 190.

The 5 Star Companies also diverted assets from the corporation to stockholders to the detriment of creditors when Gingerich was "bought out" of the company, and Plaintiff has also alleged misappropriations for other unknown personal uses by both Miller and Gingerich. Compl. ¶¶ 21, 76–84.

The 5 Star Companies also failed to maintain arm's length relationships, as evidenced by the sharing of funds, office space, staff, advertising, management, ownership, and the substantial transfer of money to Gingerich personally. Compl. ¶¶ 11, 22, 36, 76–84; *See Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 755-56 (7th Cir. 2012) (finding a shell game, shared office space, equipment, employees, and funds supported a failure to maintain arm's length relationship among related entities.).

The 5 Star Companies were mere facades for the operations of the dominant and sole shareholders, Miller and Gingerich. Defendant Gingerich asserts he was responsible

for the "operational aspects of the businesses" while Miller was responsible for advertising and investor relations. Gingerich Aff. ¶¶ 20, 27–28. Gingerich never defines his "operational" responsibilities, but, as a threshold matter, it would seem that the 5 Star Companies' "operations" are one of the problematic aspects of the enterprise. There is also reason to be skeptical of this assertion in light of the fact that Gingerich was regularly referenced and featured in advertising on behalf of the Company. Compl. at ¶ 48; Exhibits A–D.

Given that Gingerich and Miller were the only shareholders in the company, it is difficult to see how Gingerich could have avoided assuming a dominant role. *See e.g.*, *In re Teknek, LLC*, 354 B.R. 181, 195 (Bankr. N.D. Ill. 2006) ("When a federal court asserts personal jurisdiction against two members of a limited liability company with *only* two members and a handful of employees, virtually all of the significant planning, acting, directing, and masterminding will be attributable to one member, the other, or both, making them the 'primary participants.'"). Numerous documents referenced Gingerich and Miller as the founders of the 5 Star Companies, and none of these differentiated their roles or their compensation. Compl. at ¶¶ 101–102, 118, 121, 171–72, 191, 194, 222, 223, 241, 244, 271, 279). Gingerich admits that he and Miller each held 50% ownership in the companies. Gingerich Aff. at ¶¶ 17, 27. Both Gingerich and Miller also signed personal guarantees for Plaintiff's promissory note for the 4134 N. Michigan property. Compl. at ¶ 182.

The only remaining Illinois factors for determining if there is a unity of interest are the failure to issue stock; the nonpayment of dividends; and the nonfunctioning of the other officers or directors. These factors do not weigh against piercing the veil; they are

simply inapplicable in the context of an LLC owned and controlled by only two individuals. Preserving the fiction of separate corporate existence would also promote injustice and inequity for many of the same reasons there is a unity of interest; it would immunize Gingerich from liability for a fraudulent enterprise in which he played an integral role. Plaintiff's Complaint includes detailed factual allegations that support treating Gingerich, Miller and the 5 Star Companies as alter egos, and "[w]here a claimant fairly alleges an entity exists as the alter ego of another and provides factual manifestations suggesting the existence that the two operate as a single entity, a motion to dismiss must be denied." *RehabCare Grp. E., Inc. v. SAK Mgmt. Servs., LLC*, 2010 WL 3307084 at *5 (N.D. Ill Aug. 18, 2010). This Court has personal jurisdiction over Gingerich as the alter ego of the 5 Star Companies, which have undisputed sufficient minimum contacts in Illinois.

For many of the same reasons that support piercing the corporate veil, personal jurisdiction can also be established by agency principles. At a minimum, Earl Miller and the Companies were acting with Gingerich's apparent authority as co-founder and co-owner in their dealings with Plaintiff in Illinois, and because of the personal benefit that accrued to Gingerich, especially the misappropriation of investor funds, the fiduciary shield doctrine should not prevent attributing their minimum contacts to him. The motion to dismiss for lack of personal jurisdiction should be denied.

III.   **Defendant's Motion to Dismiss for Failure to State a Claim Should Be Denied in its Entirety.**

A.   **Legal Standard–Rule 9(b) and the PSLRA**

"Rule 9(b) of the Federal Rules of Civil Procedure creates exceptions to the federal regime of notice pleading and specifies that, for 'all averments of fraud or

mistake, the circumstances constituting fraud or mistake shall be stated with particularity.'" *Amakua Dev. LLC v. Warner*, 411 F. Supp. 2d 941, 947 (N.D. Ill. 2006) (quoting Fed. R. Civ. P 9(b)). The Private Securities Litigation Reform Act created additional pleading requirements for securities fraud claims, requiring "the plaintiff's complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' that is, with scienter." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) (quoting 15 U.S.C. § 78u–4(b)(2)) (internal citation omitted). For a complaint to give rise to a strong inference of scienter, the inference must be cogent and "[t]he plaintiff 'must plead facts rendering an inference of scienter *at least as likely* as any plausible opposing inference.'" *Id.* at 705, 707 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007)). Scienter is the knowledge that a "statement was false or was reckless in disregarding a substantial risk that it was false." *Id.* at 704.

The strong inference standard is essentially a comparative inquiry, because "[a]s more and more alternatives to a given explanation are ruled out, the probability of that explanation's being the correct one rises," thereby making the inference of scienter not only more likely but more cogent. *Id.* at 707, 710, 711 ("It is easier to consider the second, the comparative question, first[.]") Strong inferences of corporate scienter can be drawn "without being able to name the individuals who concocted and disseminated the fraud," and a strong inference of scienter may be drawn with respect to corporate officers "at the top of the corporate pyramid" when the competing inference is an unlikely "cascade of innocent mistakes, or acts of subordinate employees[.]" *Id.* at 710–11. In other words, a strong inference relying on these comparative probabilities does not turn

on the invocation of the group pleading doctrine, but rather from the plausibility of high level corporate officers being somehow unaware of the statements' falsity. *Id.* at 710.

### B. Plaintiff Properly Stated a Claim for Fraud (Counts I–III & VIII–XI).

Gingerich relies on more or less the same arguments made to dismiss for lack of personal jurisdiction for his attempt to dismiss for failure to state a claim Count I (Fraud– 10b-5); Count II (Use of Mails to Sell Unregistered Securities); Count III (Use of the Mails to Make False Statements); Count VIII (Breach of Fiduciary Duty); Count IX (Common Law Fraud); Count X (Constructive Fraud); and Count XI (Fraud-Illinois Securities Act). For each of these counts Gingerich contends that Plaintiff impermissibly relies on "group pleading," and as a result (1) Plaintiff has failed to allege Gingerich made any statements at all; (2) that Plaintiff has failed to allege Gingerich acted with scienter; and (3) that any allegations that do exist fail to satisfy the particularity requirements of Rule 9(b) and the PSLRA. Gingerich also contends that Plaintiff's Complaint fails to allege the two essential elements of reliance and causation. None of this is true. Plaintiff has not relied on the "group pleading doctrine." Plaintiff has alleged with sufficient particularity that Gingerich made the statements with scienter as the alter ego of the 5 Star Companies, that the Plaintiff relied on the misrepresentations, and that the misrepresentations caused Plaintiff's loss.

### i. Plaintiff's Complaint Does Not Rely on Group Pleading

Gingerich's Motion to Dismiss is largely predicated on the Seventh Circuit's rejection of the "group pleading doctrine," which is a "<u>judicial presumption</u> that statements in group-published documents including annual reports and press releases are attributable to officers and directors who have day-to-day control or involvement in

regular company operations." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (quoting *Winer Family Trust v. Queen*, 503 F.3d 319, 335 (3d Cir. 2007) (internal quotation marks omitted) (emphasis added). It simply means that a court cannot presume individual scienter for corporate statements solely on the basis of their position in the company. It does not mean that group pleading is ever "impermissible," especially not when the group of defendants were all participants in the fraud.

The unavailability of the group pleading presumption "does not render each individual defendant's position within a company irrelevant." *Desai v. Gen. Growth Properties, Inc.*, 654 F. Supp. 2d 836, 860 (N.D. Ill. 2009). A strong inference of scienter is warranted if "it is almost inconceivable that an individual defendant would be unaware of the matters at issue." *Desai v. Gen. Growth Properties, Inc.*, 654 F. Supp. 2d 836, 860 (N.D. Ill. 2009); *see also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (holding a strong inference of scienter for CEO was warranted where it was "exceedingly unlikely" he was unaware of problems and unknowingly repeating lies told to him by other executives).

Plaintiff's Complaint does not rely on the group pleading presumption for satisfying Rule 9(b). Misrepresentations are attributed to Gingerich, Miller, and the 5 Star Companies collectively for primarily two reasons: (1) information providing greater specificity is in the exclusive control of the Defendants; and (2) the misrepresentations are fairly attributed to all of them because the companies were operated as the alter egos of Miller and Gingerich–the "group" members are not meaningfully distinct.

    **ii. Plaintiff has Sufficiently Plead that Gingerich Made Material Misrepresentations Directly and as the Alter Ego of the 5 Star Companies**

The video advertisement in Gingerich appears was relied on by Plaintiff for his initial investment, and is itself, rife with misrepresentations attributable to Gingerich as described in more detail above.  Shortly after a photo of Gingerich is shown, a wheel-graphic is described in which every section of the "wheel" describing multi-family home investments is untrue.  Exhibits A–C.  The next "wheel" describing single-family home investments is practically an admission that the company was illegally soliciting investors.  Exhibit A–C.  And nowhere in the video, is there a disclaimer of any kind.  Exhibit A.

Indiana law governs the alter ego analysis for substantive claims.  *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751 (7th Cir. 2012) ("Illinois applies the law of the state of incorporation for veil piercing claims.").  The Indiana alter ego analysis considers "so-called *Aronson* factors" that are similar to the Illinois approach.  *Cont'l Cas. Co. v. Symons*, No. 14-2665, 2016 WL 1118566, at *13 (7th Cir. Mar. 22, 2016).  The *Aronson* factors include:

> (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form.

*Cont'l Cas. Co. v. Symons*, No. 14-2665, 2016 WL 1118566, at *13 (7th Cir. Mar. 22, 2016).  To determine whether two companies should be treated as a single entity, courts also consider whether they had similar names; common officers and employees; similar purpose; and whether they shared office space. *Id.*  The analysis here is virtually identical to the personal jurisdiction analysis above, with the same result.  Plaintiff sufficiently

pleaded facts supporting an alter ego theory of liability. In *Cont'l Cas. Co. v. Symons*, the Seventh Circuit found the record amply supported piercing the corporate veil where corporate formalities were ignored, companies used the same address, assets were commingled, and shareholders regularly looted the companies. *Cont'l Cas. Co. v. Symons*, No. 14-2665, 2016 WL 1118566, at *16 (7th Cir. Mar. 22, 2016). All of those factors are also present in this case. Because Plaintiff has stated a claim for an alter ego theory of liability with sufficient particularity, he has also alleged that Gingerich "made" statements with sufficient particularity.

### iii. Plaintiff's Complaint Gives Rise to a Strong Inference that Material Misrepresentations Were Made with Scienter

Plaintiff's complaint contains allegations giving rise to a strong inference of scienter. Not only were Miller and Gingerich at the "top of the corporate pyramid," they were the only people at the top of the pyramid, and exerted control over virtually every aspect of the business. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008); *see* Exhibit U-Trustee Mot. for Substantive Consolidation at 16, Dkt. 272, *5 Star Investment Group, LLC*, Case No. 16-30078 (Bankr. N.D. Ind.) (May 17, 2016) ("[All of the 5 Star Companies] were operated by Miller and Gingerich who were also the owners of all the entities. There were no other directors, managers or officers, and no corporate minutes."). Not only is there a strong inference of scienter, there is not even a competing inference due to the same factors that make Gingerich subject to alter ego liability. The level of involvement and control coupled with the lack of other individuals to blame lends itself to only one plausible conclusion: that Gingerich and Miller knowingly operated their companies to defraud investors.

### iv. Plaintiff has Sufficiently Alleged Reliance and Causation.

Plaintiff's complaint sufficiently alleges reliance and causation for every claim. Gingerich contends, not that Plaintiff's complaint failed to allege reliance and causation with sufficient particularity, but that it failed to plead these elements at all. (Mot. to Dismiss at 26, 3334, 38). This argument is premised on little more than technicalities and must be rejected because it is inconsistent with the only fair reading of the complaint. Plaintiff's complaint contains numerous allegations that can only be understood as alleging reliance and loss causation. It alleges "Miller, Gingerich, and their investment entities repeatedly lied to Plaintiff in order to secure his initial investments, to retain control of those same investments," that "Defendants Miller, Gingerich, and their investment entities deceived Plaintiff into believing that all of his notes were secured by first mortgages," that "[m]aterial misrepresentations about the investments' security interests were also accomplished through oral and/or written statements by Defendants Miller, Gingerich and their investment entities," and that "Defendants Miller, Gingerich, and their investment entities also made material representations about how Plaintiff's invested funds would be used." Compl. ¶¶ 11, 15, 17, 21. These allegations are then supported with numerous specific examples from the Defendants' advertising and corporate documents.

A misrepresentation is material precisely because it may be justifiably relied on as "relevant to the decision that the perpetrator of the fraud wants his intended victim to make." *United States v. Coffman*, 94 F.3d 330, 335 (7th Cir. 1996). The only plausible reason for Plaintiff to detail the material misrepresentations attributable to Gingerich in the complaint is because he relied on them in his decision to invest in the Defendants' fraudulent enterprise. Similarly, Plaintiff's various allegations about the fraudulent

enterprise, including but not limited to his allegation that "invested funds were used to make large payments to both Miller and Gingerich, including over $600,000 paid to Gingerich," can only be understood as alleging causation for the loss of his entire life savings. (Compl. at ¶ 21). Plaintiff allegations cannot be more detailed without information in exclusive control of the Defendants. These details cannot be the basis for dismissing the Complaint because "[s]pecificity requirements may be relaxed, of course, when the details are within the defendant's exclusive knowledge." *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994).

### C. Plaintiff Properly Stated a Claim Under Section 12 of the 1933 Securities Act (Counts II & III).

Defendant Gingerich also attempts to dismiss Counts II and III on two additional grounds: (1) that Gingerich is not a statutory seller; and (2) the promissory notes were not part of a public offering. Mot. to Dismiss at 29, 31.

Statutory sellers are "parties who pass title or directly solicit or offer to the plaintiff." *Daniels v. Blount Parrish & Co.*, 113 F. App'x 174, 176 (7th Cir. 2004). This does not include "participants' collateral to the offer or sale" unless they are "motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 647, 650 (1988).

For the same reasons described above, Gingerich is a statutory seller because the actions of Miller and the 5 Star Companies are attributable to Gingerich, either under the alter ego doctrine or under agency principles. Gingerich reliance on *Pinter v. Dahl* is inapposite, because Gingerich is not being sued as a "seller's seller." 486 U.S. 622, 643–44 n.21 (1988). Nor is Gingerich being sued "solely by virtue of [his] position[] within the company." *Starr v. !Hey, Inc.*, 2003 WL 21212596, *4 (N.D. Ill. May 23, 2003).

Gingerich and Miller are being sued because they were the company, the sellers, and the owners. Gingerich's admitted responsibility for the 5 Star Companies' operations, could not possibly be "collateral to the offer or sale" because the issuing of the securities were the essence of the 5 Star Companies' operations. And the selling of the securities could only have been motivated by a desire to serve Gingerich's financial interests.

The securities purchased by Plaintiff were part of a public offering because the Defendants failed to abide by the restrictions necessary to qualify for Rule 506 exemptions from registration. When determining whether a security is part of a public offering, the "focus of the inquiry should be on the need of the offerees for the protections afforded by registration." *ABN Amro, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 832–33 (N.D. Ill. 2008) (quoting *SEC v. Ralston Purina Co.*, 346 U.S. 119, 125, 127 (1953)). The relevant factors include "(1) the number of offerees and their relationship to the issuer; (2) the number of units offered; (3) the size of the offering; and (4) the manner of the offering." *Id.*

The Rule 506 exemption is an affirmative defense to Section 12 claims, and "the burden of proof is on the party claiming the benefit[.]" *Id.* at 833. Generally speaking, "the validity of an affirmative defense cannot be resolved under Rule 12(b)(6)." *Id.* Allegations that securities were not registered and made use of the mails "are all that is required to establish a prima facie violation" of Section 12. *Id.*

Gingerich has failed to meet the burden of establishing an affirmative defense because Plaintiff's allegations detail numerous violations of the Rule 506 exemption requirements. The complaint alleges that the 5 Star Companies engaged in general advertising in violation of 17 C.F.R. § 230.502(c). Compl. ¶¶ 4, 8, 48; Exhibits A–D.

The complaint's allegation that "[t]here is little to no meaningful distinction between the dozens of companies they created, with many of them operating as each others' managers and holding accounts" supports integration of the various offerings in violation of § 17 C.F.R. § 230.502 since the sales were part of a single plan of financing, involve the same class of securities, and would be for the same general purpose. Compl. ¶ 22. Plaintiff can also provide additional evidence to rebut this affirmative defense from the SEC filings, as well as filings with the bankruptcy court. One filing for 5 Star Investment Group VII, LLC claimed an exemption under Rule 506(b), but listed the current number of investors as 38 which blatantly exceeds the limitation on the number of purchasers imposed by the rule. Exhibit Q; 17 C.F.R. § 230.506(b)(2)(i). The bankruptcy trustee also claims to be in possession of a document where "Miller or his former partner Gingerich acknowledges that the separate entities were set up to comply with regulation D" by ensuring that no one company had more than 35 accredited investors and that Miller admitted this on cross-examination. Exhibit U-Trustee Mot. for Substantive Consolidation at 6, Dkt. 272, *5 Star Investment Group, LLC*, Case No. 16-30078 (Bankr. N.D. Ind.) (May 17, 2016).

Given the well-supported allegations of Rule 506 violations, as well as the fact that Plaintiff is precisely the type of investor meant to be protected by the rules imposed on public offerings, Gingerich's affirmative defense should be rejected and his motion to dismiss Counts II and III denied.

### D. Plaintiff Properly Stated a Claim for Breach of Fiduciary Duty and Constructive Fraud (Counts VIII and X).

Defendant Gingerich also attempts to dismiss Counts XIII and X on the additional grounds that Gingerich did not owe Plaintiff a fiduciary duty. Under Illinois law,

corporate directors owe a fiduciary duty to creditors once the company has become insolvent. *PharMerica Chicago, Inc. v. Meisels*, 772 F. Supp. 2d 938, 960 (N.D. Ill. 2011) ("In other words, from the moment a corporation becomes insolvent, its assets of the corporation are deemed to be held in trust for the benefit of its creditors.") (quotation marks and citation omitted). A debtor is insolvent under Illinois law "if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation" and a debtor will be presumed insolvent if they are not generally paying debts as they become due. *Id.* at 961 (quoting 740 ILCS § 160/3(a)-(b)).

Plaintiff's allegations describe a fraudulent enterprise that, under this definition, may have never been solvent, instead relying primarily on the recruitment of new principal investment in order to pay prior debts. Gingerich alleges that he transferred ownership to Miller in July of 2014. Mot. to Dismiss at 2. Plaintiff's allegation that Gingerich was paid for the transfer with investor funds is itself evidence of the Companies' insolvency and inability to meet obligations without misappropriation of the Companies' finances. Compl. at ¶ 81. Gingerich's motion to dismiss Counts VIII and X should be denied.

### E. Plaintiff has Properly Stated a Claim for Breach of Contract (Count IV).

Gingerich's argument that Plaintiff has failed to state a claim for breach of contract because the personal guarantee expired lacks support, is contradicted by evidence in the record, and represents a factual dispute that must be resolved in Plaintiff's favor. Plaintiff has also pleaded sufficient facts to support a claim that Gingerich and 5 Star Investment Group VII, LLC were alter egos, and therefore Plaintiff has properly stated a claim to hold Gingerich personally liable for the debt.

Gingerich's argument that the personal guarantee expired rests entirely on the subdivision and partial sale of the property. Gingerich Mot. to Dismiss at 39. The relevant language provides that "[t]his Guaranty shall expire and terminate upon the completion of the rehabilitation and remodeling of the real estate located at 4134 N. Michigan, Portland, OR 97217." Compl. A-53. When the guaranty was executed, the property had not yet been subdivided, and "completion" presumably referred to the completion of the rehabilitation of the entire property, not a portion of it. Even if a guarantor is in fact a "favorite of the law" in other circumstances, notice pleading favors plaintiffs. Gingerich has provided no support for his conclusion that because a fraction of the property's rehabilitation was completed, the remainder of the development was also successfully completed. At minimum, this represents a dispute that must be resolved in Plaintiff's favor, even if Gingerich turned out to be correct about the completion of the remodeling. But in fact, the Metro Homes lawsuit against the 5 Star Companies strongly indicates that the remodeling was not completed. Metro Homes claims that 5 Star failed to fully fund the project. Exhibit V at ¶¶ 17–24. Metro Homes also alleges that 5 Star failed to fill August 4, 2015 draw requests to pay subcontractors for work on the property, which postdates the May 2014 sale of the subdivision by well over a year. Exhibit V at ¶ 101.

Development on the rest of the parcel clearly continued well after the sale. And for the same reasons discussed above, Gingerich is potentially liable as the alter ego of 5 Star Investment Group VII, LLC, and even he concedes that 5 Star Investment Group VII, LLC may be in breach. (Gingerich Mot. to Dismiss at 39). This Court should deny Defendant's Motion to Dismiss Count IV for failure to state a claim.

## IV. The Northern District of Illinois is the Appropriate Venue.

### A. Legal Standard

Transferring this case to the Northern District of Indiana will only be appropriate if it "will serve the convenience of the parties and witnesses, and will promote the interest of justice." *Plotkin v. IP Axess, Inc.,* 168 F. Supp. 2d 899, 902 (N.D. Ill. 2001). Relevant to the convenience analysis are: (1) Plaintiff's choice of forum; (2) the situs of material events; (3) the relative ease of access to sources of proof; (4) the convenience of the parties; and (5) the convenience of the witnesses. *Id.* at 902 (N.D. Ill. 2001). "The party seeking a Section 1404(a) transfer bears the burden of showing that 'the transferee forum is clearly more convenient' than the transferor forum." *Vandeveld v. Christoph*, 877 F. Supp. 1160, 1167 (N.D. Ill. 1995). The "plaintiff's choice of forum is usually accorded significant weight" especially "when the chosen forum also is a plaintiffs home forum." *Lee v. Love's Travel Stops & Country Stores, Inc.*, No. 15-CV-7774, 2015 WL 6742074, at *2 (N.D. Ill. Nov. 3, 2015). A Defendant "must show a clear balance of inconvenience before Plaintiff's choice of forum is disturbed." *Id.* (internal quotation and citation omitted). When the situs of material events occurred elsewhere, the "[p]laintiff's choice of forum weighs heavily against transfer but not as heavily as it would" otherwise. *Id.*

Factors relevant to the interests of justice are the (1) relations of the community to the issues; (2) ensuring speedy trial; and (3) the court's familiarity with applicable law." *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 220-21 (7th Cir. 1986).

### B. A Venue Transfer Does Not Serve Convenience.

Illinois is Plaintiff's home forum, and this weighs heavily against transfer. Even if the situs of material events occurred elsewhere, Plaintiff's choice of his home forum

remains an important factor, and does not become "simply one of many factors" to be considered by the court. Gingerich contends Indiana is the situ of material events in this case because the transactional documents were prepared in Indiana. Mot. to Dismiss at 20. As support for this, he cites to Plaintiff's Complaint. But Plaintiff's Complaint contains no allegations about where documents were prepared, and Gingerich throughout his motion seems to profess ignorance of how the Private Placement Memorandums and other documents came into existence. While 5 Star had an office in Indiana, it also solicited Plaintiff's investments in Illinois, invested in properties in Indiana, Oregon, North Carolina, and Texas, and utilized internet advertising that lacks any specific geographic location. Many of the documents related to Plaintiff's investments were presumably executed in Oregon and Illinois, and potentially merely routed through the "office" in Indiana, that seems to have employed virtually no one except Miller and Gingerich. To the extent the situs of material events diminishes the weight accorded to a plaintiff's choice of forum, it should do so even less in this case.

The ease of access to proof factor is insignificant given "the ready availability of photocopying and the relative ease with which documents may be selectively shipped around the country[.]" *Lee v. Love's Travel Stops & Country Stores, Inc.*, No. 15-CV-7774, 2015 WL 6742074, at *2 (N.D. Ill. Nov. 3, 2015) (quoting *AL & PO Corp. v. Am. Healthcare Capital, Inc.*, 2015 WL 738694, at *3 (N.D. Ill. Feb. 19, 2015). Gingerich identifies nothing except documents which can presumably be scanned and e-mailed, and indeed will likely be scanned and e-mailed regardless of whether the litigation is in Indiana or Illinois.

Rather incredibly, Defendant argues that convenience of the parties supports transfer because the inconvenience to Plaintiff would be "minimal." Mot. to Dismiss at 20–21. This presumably implies that Gingerich would be inconvenienced to a greater degree for some unarticulated reason, since without more this factor would be neutral. But far from being neutral, Plaintiff would be substantially harmed by a transfer for at least two reasons. First, having lost his entire life savings as a result of the events underlying this case, no longer being able to take a direct train from Lake Bluff to Chicago would dramatically increase the difficulty for him to travel to court. Second, the size of Plaintiff's claim means his unable to find representation outside of a law school legal clinic at all, and certainly not the type of representation the Defendant is clearly able to afford. This means law students play an integral role in Plaintiff's representation, and in Illinois law students are allowed to appear in court under Ill. Sup. Ct. Rule 711. While Indiana has a comparable rule, it requires supervision by an attorney barred in Indiana. Ind. R. of Court 2.1. The attorney supervising the clinic responsible for Plaintiff's case is not barred in the state of Indiana, and therefore will be unable to supervise the students in his clinic in the state of Indiana. Not only will Plaintiff be inconvenienced, his counsel's effectiveness will be diminished.

Defendant's arguments regarding inconvenience to potential witnesses cannot be properly considered. That section of the motion contains only two sentences and manages to name only one specific witness who might be called, and that one witness is not even known to be in Indiana. Mot. to Dismiss at 21. Far from supporting transfer, by "providing no specifics as to their identities or testimony" this factor can at best be considered neutral. *Taylor v. Midland Funding, LLC*, 94 F. Supp. 3d 941, 945-46 (N.D.

Ill. 2015); *Moore v. AT & T Latin America Corp.*, 177 F. Supp. 2d 785, 790 (N.D. Ill. 2001) ("These key witnesses must be identified and their expected testimony described with more than vague generalizations.") (internal quotation marks and citation omitted).

Given that many of the potential witnesses who could testify to the business practices of the 5 Star Companies and the involvement of Gingerich in them are from out-of-state, convenience likely weighs against transfer given Chicago's status as a transportation hub. For example, Vlad Rudnitsky and Chris Baird of Dilusso Homes, and Randall Palazzo of Metro Homes Northwest all presumably reside in Portland, Oregon. Were they to be called as witnesses to testify about the development agreement associated with the 4134 N. Michigan property, or about any other properties, it is a fair assumption they would rather make a trip to Chicago rather than a trip to South Bend or Hammond via Chicago. The same reasoning would apply to any witnesses Plaintiff is able to locate in connection with the North Carolina investment. Earl Miller's whereabouts are unknown, but rumors place him in Colorado, which means Chicago is actually closer to him than Indiana as well, and should he be located Plaintiff would be interested in calling him to testify about Gingerich's role in any and every aspect of the 5 Star Companies.

### C. A Venue Transfer Does Not Serve Justice.

Gingerich concedes the speedy trial factor favors retention and that familiarity with the applicable law factor is neutral. Mot. to Dismiss at 21-22. He does contend that the relation of the community favors transfer because the principal place of business was in Indiana, some unnamed number of employees are located in Indiana, and the Companies are also accused of defrauding Indiana residents. But no Indiana residents are

plaintiffs in this case. The mere fact *some* employees *may* reside in Indiana is "balanced by Illinois' strong interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state-actors." *Lee v. Love's Travel Stops & Country Stores, Inc.*, No. 15-CV-7774, 2015 WL 6742074, at *5 (N.D. Ill. Nov. 3, 2015) (quoting *First Nat. Bank v. El Camino Res., Ltd.*, 447 F. Supp. 2d 902, 914 (N.D. Ill. 2006).

To summarize, five of the eight factors strongly favor retention, two of them are neutral, and one may slightly favor transfer. Transfer would burden Plaintiff and most witnesses, and it would also burden the effectiveness of Plaintiff's legal representation. The motion to transfer venue should be denied.

## CONCLUSION

As pointed out in the Motion to Dismiss, Plaintiff's Complaint is 58 pages long and contains 366 separate paragraphs. Despite the length, Gingerich's Motion to Dismiss amounts to an argument that it failed to make any plausible and particular allegations against him. An alternative reading of the Complaint suggests a number of specific misrepresentations and fraudulent acts by Gingerich, or by Miller on his behalf, that deprived Plaintiff of his life savings, and that more than satisfy the stringent pleading requirements of Rule 9(b) and the PSLRA and were sufficient to put Gingerich on notice of the claims against him. This reading is supported by a number of additional materials attached to this Response to rebut Gingerich's Motion to Dismiss and affidavit. Plaintiff has also demonstrated a sufficient basis for personal jurisdiction, and for finding the Northern District of Illinois to be the appropriate venue.

WHEREFORE Plaintiff William Adamczyk respectfully asks this Court to deny the Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, for Failure to State a Claim, and for Venue Transfer in its entirety.

Respectfully Submitted,

William Adamczyk

**May 19, 2016**          By:  <u>/s/ J. Samuel Tenenbaum</u>

J. Samuel Tenenbaum
Joseph Delich – JD Candidate 2016 (No. 2015LS00190)
Bluhm Legal Clinic
Northwestern University School of Law
375 E. Chicago Avenue
Chicago, Illinois 60611
(312) 503-4808 (telephone)
(312) 503-8777 (facsimile)
s-tenenbaum@law.northwestern.edu
j-delich2016@nlaw.northwestern.edu
*Counsel for William Adamczyk*